STATE of Tennessee, Appellee,

v.

James L. CARTER, Appellant.

Court of Criminal Appeals of Tennessee,
at Jackson.

March 19, 1997.

Application for Permission to Appeal
Denied by Supreme Court
Dec. 15, 1997.

W. Mark Ward, Assistant Shelby County Public Defender, A.C. Wharton, Shelby County Public Defender, Memphis, for Appellant

Charles W. Burson, Attorney General and Reporter, Darian B. Taylor, Attorney General, Nashville, John W. Pierotti, District Attorney General, Charles Bell, Assistant District Attorney, Memphis, for Appellee.

## OPINION

LYNN W. BROWN, Special Judge.

The appellant, James L. Carter, was convicted of the offense of murder in the first degree and sentenced to life in prison. He has appealed from that conviction, alleging the following: 1) that the constitutional provisions against double jeopardy should act to preclude his retrial after a previous trial ended in a mistrial, 2) that the testimony of two witnesses should not have been admitted because the state failed to preserve the testimony of those witnesses from the preliminary hearing, 3) that the evidence was insufficient to convict of murder in the first degree, and 4) that it was error to admit testimony that the victim had stated before her death that the appellant had threatened her. After a careful review of the record we find no reversible error, and we therefore affirm the conviction.

### I. Double jeopardy.

The Shelby County Grand Jury returned an indictment against James L. Carter on May 19, 1992, charging him with murder in the first degree. He was appointed the public defender, and the first jury trial on this charge began March 1, 1993. After the jury was sworn and testimony had begun, multiple problems arose including crucial new witnesses and newly discovered physical evidence, a pistol which the state alleged was the murder weapon. The state proposed to have ballistics tests performed on the pistol for use during the trial. One of the new witnesses was represented by the public defender on other charges, posing a potential conflict to that counsel. Faced with all of these problems the trial judge declared a mistrial *sua sponte,* over the objection of the appellant.

■ The appellant filed an interlocutory appeal to this court alleging that to try him again would violate the constitutional provision against double jeopardy. This court found that there was manifest necessity for the trial court to declare a mistrial so that there would be no double jeopardy violation in a new trial, but precluded the state from using the felony murder aggravating circumstance in seeking the death penalty upon retrial. *State v. Carter*, 890 S.W.2d 449 (Tenn.Crim.App.1994). The appellant did not file for permission to appeal to the Tennessee Supreme Court. Now the appellant attempts to relitigate the issue of mistrial and double jeopardy. Based upon proof in the second trial and matters which developed after the opinion of this court on the matter, we are urged to reverse our 1994 decision.

■ "A ruling or decision once made in a particular case by an appellate court, while it may be overruled in other cases, is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review. A ruling or decision so made is said to be 'the law of the case'." *Clements v. Pearson*, 352 S.W.2d 236, 237, 209 Tenn. 223 (1961), quoting Black's Law Dictionary, Third Edition.

"The law of the case, res judicata, and stare decisis belong to the same family in that they have in view the termination of controverted questions of fact and law. The law of the case, however, is distinguished from res judicata, in that the law of the case does not have the finality of the doctrine of res judicata, and applies only to the one case, whereas res judicata forecloses parties or privies in one case by what has been done in another case, although in its essence it is nothing more than a special and limited application of the doctrine of res judicata or former adjudication, and what is known as 'the law of the case', that is, the effect and conclusiveness of a former decision in the subsequent proceedings in the same case, has been generally put upon the ground of res judicata." *Clemets* p. 237, quoting 21 C.J.S. Courts § 195.

We are of the opinion that since there was no request for permission to appeal filed with the Supreme Court for a review of our 1994 decision regarding double jeopardy in the previous interlocutory appeal, the decision of this court became final and is the law of the case. See *also, e.g., Bivins v. Hospital Corporation of America*, 910 S.W.2d 441, 442 (Tenn.App.1995); *State v. Delk* 692 S.W.2d 431, 438 (Tenn.Crim.App.1985); *Ernst v. Bennett*, 38 Tenn.App. 271, 273 S.W.2d 492 (1954); *Life & Casualty Ins. Co. v. Jett*, 175 Tenn. 295, 133 S.W.2d 997 (1939); *City of Bristol v. Bostwick*, 146 Tenn. 205, 240 S.W. 774 (1921); *Underwood v. Martin*, 2 Tenn. (2 Overton) 190 (1812). There was no error or violation of double jeopardy in the retrial of the appellant.

## II. Preliminary hearing testimony.

■ The appellant alleges that because the State failed to preserve a recording of the preliminary hearing, the trial court should have prohibited the testimony of two juveniles, Edward Love and Marcaidus Dishmon, both of whom testified at the preliminary hearing. Both were crucial witnesses to the state's circumstantial case. Their testimony is summarized in the following when we consider the sufficiency of the evidence.

Rule 5.1(a), Tennessee Rules of Criminal Procedure provides that at a preliminary hearing, "proceedings shall be preserved by electronic recording or its equivalent and when the defendant is subsequently indicted such recording shall be made available for listening to by the defendant or defendant's counsel to the end that they may be apprised of the evidence introduced upon the preliminary examination." The rule states no sanction for failure to prepare, preserve, and make available such a recording.

From the record in this case we are unable to determine what happened to the tape of appellant's preliminary hearing in this case. At a pre-trial hearing which preceded the first trial counsel for the state indicated that they had thoroughly searched for the tape recording, but could not locate it. Apparently, the State had delivered a tape recording to the defense in the belief that it was the tape of the preliminary hearing, but it was not. The trial court found both before the

first trial and the second trial that the State could not be ordered to turn over something that it did not have. The appellant's motion to suppress the testimony of Dishmon and Love on this ground was effectively denied.

The failure to provide a recording or its equivalent may constitute harmless error. *State v. McBee,* 644 S.W.2d 425 (Tenn.Crim. App.1982); *State v. Butts,* 640 S.W.2d 37 (Tenn.Crim.App.1982). The state's proof in each of those cases was characterized as being overwhelming. The circumstantial proof in this case does not rise to that level. However, we can find nothing in the record which indicates that the petitioner was prejudiced by the lack of an electronic recording of his preliminary hearing. The only allegation of an inconsistency in the testimony of either of these witnesses is that one of the youths "froze" at the preliminary hearing and was unable to make any statement at all. If this in fact occurred, it could have been elicited by means other than the use of a tape recording of the preliminary hearing. Additionally, trial counsel was able to use the prior testimony of both witnesses in the first trial to cross examine them at the second trial, and did so quite ably. Counsel also made appropriate use of statements the boys had previously given to the police for cross examination. The proper remedy when an electronic recording of a preliminary hearing is lost or unavailable would be to request the trial court to dismiss the indictment and remand to the General Sessions Court for a second preliminary hearing. See *State v. Malvin Louis alias Marvin Louis Rushton,* No. 1260 (Tenn.Crim.App., at Knoxville, filed May 11, 1990). No such request was made in this case.

Under these circumstances, although the appellant was represented by different counsel at preliminary hearing and at trial, we find that the loss of the recording of the preliminary hearing was at most harmless error. Tenn. R.App. P. 36(b); Tenn. R.Crim. P. 52(a).

### III. Sufficiency of the Evidence

The testimony of the key witnesses in this case is summarized as follows. Larry Paige testified that he had been dating the murder victim, Lisa Renee Watkins, for about two weeks at the time of her death on November 22, 1991. On the day of the murder Larry Paige visited with Ms. Watkins at her apartment in Memphis at about 4:00 p.m., and then departed. When he returned about an hour later, Ms. Watkins' door was unlocked, which was not her custom. Mr. Paige entered her kitchen and found the stove on and cookies prepared to be baked. Upon going upstairs he found Ms. Watkins lying face down on her bedroom floor and unresponsive. The closet door was open and articles from Ms. Watkins' purse were strewn upon her bed, unlike when he had left. Mr. Paige was concerned that there might be someone posing a danger to him still in the apartment, so he went next door and asked the neighbor to call the police.

Dr. Jerry Francisco, pathologist and county medical examiner, testified that the cause of death for Lisa Watkins was a bullet which entered her left back just below the arm attachment to the chest. The bullet passed through Ms. Watkins hitting her heart and lungs, coming to rest just beneath the breastbone in the front.

Mr. Paige had known the defendant, James L. Carter, for some time. The defendant had dated Ms. Watkins prior to Paige dating her. Paige testified that several weeks before the murder he had witnessed an altercation between the defendant and Ms. Watkins. Ms. Watkins and the defendant were arguing and "physically fighting." When Ms. Watkins and Paige went inside Ms. Watkins' apartment, the defendant kicked on the door, saying "there wasn't going to be no rest haven," and that he was going to burn the house down. Ms. Watkins called the police. Prior to the murder Paige had seen Ms. Watkins in possession of a .380 automatic pistol.

Toby Maxwell lived in the same apartment as the victim, out of her kindness. He was not romantically involved with Ms. Watkins, and called her "sister." Mr. Maxwell testified that the defendant and Ms. Watkins had dated. After they broke up the defendant came to her apartment, got into a fight with her, and took her gun. Mr. Maxwell had

heard Mr. Carter say to the victim that if he couldn't have her, nobody else was.

Ruth Brown testified that on the day of the murder she had a telephone conversation with the victim, Lisa Watkins, at about 5:30 p.m. Ms. Brown spoke regularly with Ms. Watkins, at least once every day. Ms. Watkins told her that she had been dating the defendant, James Carter, but had started to date Larry Paige. Ms. Watkins also told Ms. Brown that the defendant had told her that if "she couldn't be with him she couldn't be with anybody," and further that there would be no rest haven for her. Ms. Watkins had called the police twice on the defendant, once when he took her pistol from her which the police made him give back, and another time when they were fighting. Ms. Brown advised her to move from her apartment, but she refused.

On the day following the murder, Ronald Wilkinson, an investigator for the Memphis Police Department, took a tape-recorded statement from the defendant as follows: Mr. Carter stated that he was not in Ms. Watkins' apartment on the day of the murder and had not been there for about three weeks to a month, the last time being an occasion that the police had been called. The police came because Carter had "jumped on" Ms. Watkins, and he had her gun. Mr. Carter stated that he returned the gun, a .380 automatic pistol, to her that night. Also in the statement Mr. Carter described his activities on the day of the murder, which included riding around with Michael Carrick for most of the afternoon.

Officer Leslie Currin of the Memphis Police Department testified that she went to the defendant's apartment after the murder to pick him up. When she and other officers arrived, Mr. Carter was talking on the telephone. He hung up the telephone and stated "I don't know what you all are looking for me for. I didn't kill that girl." Mr. Carter explained to the officers that his sister had told him that someone had shot Lisa Watkins, and that she was dead. The defendant gave the officers different versions of when he had last seen the victim. Mr. Carter also told the officers that he and Ms. Watkins had several fights in the past because she was cheating on him for someone named Larry, but this was all in the past.

Gerald Speed grew up in the same neighborhood as the defendant. He testified that on the afternoon of the murder he observed James Carter go over to the victim's house at about dusk, and saw Carter at her front door. He also testified that he had obtained a .380 semiautomatic pistol from Arthur Ramsey. The pistol was admitted into evidence. A sales slip from a pawn shop recorded that Ms. Watkins had purchased that pistol and some ammunition on November 1, 1991. Ricco Raybon testified that on the day Lisa Watkins was murdered Michael Carrick came to his house at about 5:30 or 6:00 p.m. Mr. Carrick pulled out the pistol and asked Mr. Raybon to keep it. Raybon asked no questions, but kept the pistol until he sold the pistol to Arthur Ramsey. A ballistics examination revealed that the bullet which killed Ms. Watkins was fired from the .380 automatic pistol.

On the day of the murder Gwendolyn Clark was in the apartment next door to Lisa Renee Watkins. About dusk she heard three gunshots coming from Ms. Watkins' apartment. Ms. Clark put her ear to the wall adjoining the Watkins apartment and heard a male voice ask "Renee, where the thing at? [sic] Where the thing at [sic], Renee?" after which Ms. Clark heard Ms. Watkins mumble something. About five minutes later Ms. Clark heard the back door of the victim's apartment close. She went to the window but did not see anyone. Gunshots being somewhat common at the apartment, she did not call the police. The gunshots were confirmed by Bobby Hamilton who heard two gunshots while talking to Ms. Clark's daughter on the telephone.

Edward Love, age eleven at the time of trial, was playing football near the victim's home with Marcaidus Dishmon on the afternoon of the murder. Young Mr. Love testified that he saw James Carter come out the back door of Lisa Watkins' apartment and then go back in. Shortly afterwards Mr. Love heard two shots, then observed the defendant and another man come around the building running. It was dark, and he could not identify the other man. Marcaidus Dish-

mon, age 13, also testified that while he was playing football he heard two shots coming from the direction of Lisa Watkins' apartment. About three seconds later he saw two men coming around the victim's apartment. The men were jogging, not running. One of the men was the defendant, who had something with a black handle on it. The defendant put the object in his coat. It was kind of dark outside. Mr. Dishmon also could not identify the second man. Both of these young witnesses were certain in identifying the defendant at trial and did so in a photo line up shortly after the murder.

On behalf of the defendant, Arthur Ramsey testified that he had never acquired a gun from Ricco Raybon, nor had he ever provided a gun to Gerald Speed. Further, that he never at any time had a .380 semiautomatic pistol in his possession. Mr. Ramsey was incarcerated for a conviction for robbery.

The defendant, James Carter, testified that the deceased Lisa Renee Watkins had been his girlfriend for several months. During their relationship they had several arguments and one physical altercation. About three weeks to a month before she was murdered, Lisa Watkins pulled a gun on Mr. Carter. He took the gun away from her, but gave it back later when she was going to call the police. That event ended their relationship; Mr. Carter was never around her afterwards. Although he had a key to Ms. Watkins' apartment, Mr. Carter returned it when he moved out.

On the afternoon of the murder Mr. Carter testified that his current girlfriend dropped him off at the victim's apartment complex at about 3:00 p.m. where he met Michael Carrick and Karlton Carrick. The three men went riding around to Germantown, purchased beer and some ammunition. At about 6:00 p.m. when it was dark, Michael Carrick and the defendant got out at a restaurant near the same apartment complex. Karlton Carrick joined them shortly afterwards. The three men retrieved a .22 caliber pistol from Michael Carrick's house, and the defendant tested it by shooting twice up into the air at a location distant from the victim's apartment. He gave the pistol back to Michael Carrick. Mr. Carter proceeded to the store

and arcade, and upon leaving saw flashing lights. Mr. Carter's sister informed him that Larry had found Renee dead in the house; someone had shot her. Mr. Carter went to his house where he was arrested. He testified that he had not been to Lisa Renee Watkins' house on the day of her murder, and that he did not kill her. Mr. Carter did identify the weapon in evidence as belonging to Ms. Watkins. He denied ever threatening to burn her house down and denied saying if he could not have her, no one would.

Michael Carrick testified that he had accompanied the defendant on the afternoon of the murder, traveling the places as Mr. Carter had testified. They never went to Lisa Watkins' house. After dark, around 6:00 p.m. Mr. Carter shot the .22 caliber gun twice, and then he headed toward a store. Michael Carrick gave the .22 caliber gun to the police after the murder, but was told it was not the gun they were looking for. Mr. Carrick testified that he did not give a .380 semiautomatic pistol to Ricco Raybon on the day of the murder or afterwards.

Karlton Carrick, a cousin to Michael Carrick, testified to the same sequence of events, that he had been with the defendant and Michael Carrick from about 3:30 p.m. to 5:30 p.m. on the day of the murder. Further that he did not know Lisa Watkins and had never been to her house.

Marcus Roddie testified that approximately a little after 5:30 p.m. on the day of the murder he saw the defendant walking to the store, and joined Mr. Carter in going there. When Mr. Roddie left, the defendant was in the arcade portion of the store. Derrick Smith testified that on that day he saw the defendant with his two sisters, Renell and Pearline Carter, in the evening before dark in a parking lot near Smith's residence. Mr. Carter lived near Smith in the same apartment complex as the victim. Mr. Smith could not state the time at which he saw the defendant.

Renell Carter, sister to the defendant, was at home watching television on the evening of the murder when a girl from next door knocked on the door and said that Renee was dead. Ms. Carter walked around to the vic-

tim's apartment where she saw an ambulance and police cars. Ms. Carter was walking back to her house when she saw the defendant coming from the store. Ms. Carter told the defendant that Ms. Watkins had been found dead. It was dark outside, probably about 6:00 p.m.

When the sufficiency of the evidence is challenged, the standard of review by an appellate court is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn.1985); Tenn. R.App. P. 13(e). This rule applies to verdicts based on both direct and circumstantial evidence. *State v. Thomas*, 755 S.W.2d 838, 842 (Tenn.Crim.App.1988); *State v. Lequire*, 634 S.W.2d 608, 614 (Tenn.Crim.App.1982). Circumstantial evidence may be used exclusively to establish guilt for a criminal act. *State v. Bohanan*, 745 S.W.2d 892, 895 (Tenn.Crim. App.1987). *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn.Crim.App.1988). For this to occur, the circumstantial evidence must be consistent with the guilt of the accused, inconsistent with his innocence, and must exclude every other reasonable theory or hypothesis except that of guilt. *State v. Tharpe*, 726 S.W.2d 896, 900 (Tenn.1987).

 The jury decides the weight to be given to circumstantial evidence as well as the inferences to be drawn, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn.1958); *State v. Coury*, 697 S.W.2d 373, 377 (Tenn.Crim.App.1985). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913 (Tenn.1982). It is not the function of this court to reweigh evidence adduced at a criminal trial. A guilty verdict, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in testimony in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627 (Tenn. 1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

 The testimony in this case placed the appellant, James Carter, entering the victim's apartment immediately before shots were fired in her residence. Moments later the appellant was observed running or jogging from the direction of her residence. Through a series of transactions, the murder weapon was traced to Michael Carrick, who accompanied Mr. Carter on the afternoon of the murder. Prior to the murder, Mr. Carter had threatened to burn the victim's home and stated that her home would be no "rest haven," referring to the victim's new relationship with the boyfriend who had replaced the appellant in the victim's affections. The alibi evidence presented on behalf of the appellant still places him within a short walking distance of the scene of the murder when Ms. Watkins was killed. It seems that no witness had looked at a clock; all the times in the testimony were estimated. We find this evidence to be more than sufficient for a reasonable finder of fact to determine that James Carter was the perpetrator of the murder of Lisa Watkins beyond a reasonable doubt.

 The appellant also contends that the proof was insufficient for the jury to find the elements of deliberation and premeditation necessary to sustain a conviction of murder in the first degree. The applicable statute defines these elements as follows:

(1) "Deliberate act" means one performed with a cool purpose; and

(2) "Premeditated act" means one done after the exercise of reflection and judgment . . .

Tenn.Code Ann. § 39–13–201(b) (1989). Premeditation is defined as "a previously formed design or intent to kill." Deliberation "requires that the killing be done with a cool purpose, in other words, that the killer be free from the passions of the moment." *State v. West* 844 S.W.2d 144, 147 (Tenn.

1992). Premeditation and deliberation may be proven where "there is no direct evidence of the perpetrator's state of mind." *State v. Brown* 836 S.W.2d 530, 541 (Tenn.1992). Factors such as the use of a deadly weapon upon an unarmed victim and prior declarations of intent to kill the victim may be considered regarding both premeditation and deliberation. *Id.* 541–542.

The proof in this case as we must consider it on appeal shows that in the weeks preceding the murder the appellant made statements that he was going to burn down the victim's house; that there would be no rest haven; and that if he couldn't have the victim, no one would. We are of the opinion that such proof is sufficient for a rational finder of fact to find that the appellant had for some time considered killing Ms. Watkins. The proof is sufficient to show the reflection and judgment regarding the killing of a human being to constitute premeditation. The victim was indisputably unarmed when she was shot. The witnesses who saw the appellant shortly before and after the murder did not indicate that the appellant was in any disturbed mental state. His statements to police soon after the murder were a clear narrative of the events of that afternoon, although the jury did not find his alibi credible. We are of the opinion that the proof also sufficiently shows deliberation. This issue is without merit.

### IV. Testimony Regarding Statements of the Victim.

■ Over the appellant's timely objection, Ruth Brown was allowed to testify that the victim had related threats made by the appellant to her as summarized above. The state concedes that those statements should not have been admitted pursuant to the state of mind exception to the hearsay rule as provided in Tenn. R. Evid. 803(3), because such statements were double hearsay.

■ However, Larry Paige had testified that when the appellant was kicking on the victim's door the appellant stated that her home would be "no rest haven" and that he was going to burn down her house. Toby Maxwell testified that the appellant had said that if the victim couldn't be with him, she couldn't have anybody. Officer Wilkinson testified that the appellant had said that he had "jumped on" Ms. Watkins and taken her gun. Officer Currin testified that the appellant admitted having several fights with Ms. Watkins because she was cheating on him with a person named Larry.

After a careful examination of the record in this case we are of the opinion that the admission of Ms. Brown's testimony was in this case harmless considering the totality of the evidence. The jury would have heard testimony from other witnesses of each specific threat that the appellant made to Ms. Watkins before she was murdered, plus the incident in which the appellant "jumped on" Ms. Watkins and took her pistol. We cannot find that the testimony which was admitted in error more probably than not affected the judgment or would result in prejudice to the judicial process. Tenn. R.App.P. 36(b). Nor do we find that the error affirmatively appears to have affected the result of the trial on the merits. Tenn. R.Crim. P. 52(a). This issue is without merit.

Finding no reversible error in the trial of the appellant, James L. Carter, the judgment of the trial court is affirmed.

SUMMERS and SMITH, JJ., concur.