IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2001 Session

**STATE OF TENNESSEE v. JERRY B. GRAVES**

**Direct Appeal from the Criminal Court for Knox County**
**No. 69593    Richard R. Baumgartner, Judge**

---

**No. E2001-00123-CCA-R3-CD**
**March 26, 2002**

---

The defendant was convicted of felony murder and especially aggravated robbery and sentenced to concurrent punishment of life imprisonment and twenty-three years, respectively. In his appeal, he argues that the trial court erred in not remanding the matter for another preliminary hearing after it was discovered that the first hearing had not been recorded; in limiting his cross-examination of two prosecution witnesses as to pending matters; and in admitting an autopsy photograph of the victim's head, with the scalp pulled back, to show the gravity of his wound. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Susan E. Shipley, Knoxville, Tennessee, for the appellant, Jerry B. Graves.

Paul G. Summers, Attorney General and Reporter; Angele Michele Gregory, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Scott G. Green, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant presents the following issues in his appeal:

> I.    Whether the trial court erred in its failure to dismiss the indictment and remand the case for a preliminary hearing where the audiotape of the preliminary hearing proceedings was either lost, or otherwise inaudible.

> II.    Whether the trial court erred in prohibiting the defendant from cross-examining prosecution [witness] Karen Verklas about her

pending criminal charges, thereby impeding the defendant's right to a full and fair confrontation of the witnesses against him.

III. Whether the trial court erred in prohibiting the defendant from questioning state's witness Robert "Rabbit" Richards concerning a pending probation revocation warrant, thereby impeding a full and fair confrontation of the witnesses against him.

IV. Whether the trial court erred in admitting an autopsy photograph of the decedent's skull with the scalp pulled back and the calvarium exposed, where there was no issue that the defendant had struck the decedent in the head, the fact of the injury was presented to the jury through other testimony, and the photograph had the potential to inflame the jury.

We conclude that the issues raised on appeal are without merit and affirm the judgments of conviction.

### BACKGROUND

The State's first witness was Christina Martin, who was 17 years old at the time of the events which resulted in the indictment of the defendant. She testified that she had dated Adam Faw, and had been with him during the evening hours of October 16 and the early morning hours of October 17, 1998. That evening, in front of Faw's apartment, she was introduced to the defendant, whom she knew as "Bam," and his girlfriend, Takeita Locke, whom she knew as "Cherry." Martin and Faw were drinking alcoholic beverages in the parking lot of his apartment, but she could not recall if the defendant and Locke, who were present, were also drinking.

Faw and the defendant began to talk about a debt that Faw owed to him, but were unable to agree upon the amount. As the four of them went to the Montgomery Village Apartments, where the incident occurred, Martin was drinking alcoholic beverages and smoking what "may have been marijuana." When they arrived at the apartments, the defendant and Locke got out of the car and Faw gave his gun to the defendant. Afterwards, Martin heard a woman "screaming hysterically" and saying "[t]hey are robbing him in my house." It sounded as if the voice was coming from the same direction in which the defendant and Locke had gone. The two returned to the car, Locke with blood on her hand, and the defendant with blood on his jacket. When asked by Faw "if he had got[ten] anything and how much money he got," the defendant responded that he had gotten $50.

Martin said that, apparently two days after the incident, she was again with Faw when she took an accidental overdose of drugs and was hospitalized in an intensive care unit for three days and then in another hospital for twenty-one or twenty-eight days.

The State's next witness was Karen Verklas, who testified that on October 16, 1998, she was living in the Montgomery Village Apartments with her children and her fiancé, Robert Richards. She said that Chuck Newman, the victim, came to their apartment at approximately 4:30 a.m. on October 17, 1998, as she and Richards were sitting on the couch in the living room. She opened the door in response to Newman's knock. He entered and, as she was closing the door, "Bam," whom she identified as the defendant, also entered. The defendant approached Newman and said "[c]ome in here," asking that Newman come to the kitchen with him. She observed the defendant "hollering [to Newman], 'Give me the money, bitch.'" She said that the defendant produced a pistol and "pull[ed] back the chamber on it." Two or three times, the defendant demanded "the money" from Newman. As she watched, Newman was "scooting" towards the living room, where he ended up on the couch. Newman scooted from one end of the couch to the other, and the defendant was "on him." As Verklas was putting on her shoes to go out the door, she saw the defendant's girlfriend, Takeita Locke, whom she knew as "Cherry," come into the apartment. Verklas watched as the defendant and Newman continued to struggle, and Locke got on "the top part of his head." Both of them were trying to pry open Newman's hands. Verklas then went out the door, and Richards remained behind.

Verklas used a neighborhood's telephone to call "the law." Afterwards, she watched as the defendant and Locke left her apartment. Another man, who was on the sidewalk waving a pistol, then got into a car with the two of them. She saw the victim "struggling" to come out of her door, and said that he looked "[b]loody, scared." She said that there was blood "all over his face" and that "there was so much blood." She got a towel and tried to stop the blood coming from the top of his head. Newman said to her, "Oh, God, Karen, they have done me good this time."

During cross-examination, Verklas admitted that she had been convicted of passing worthless checks, twice in 1991 and once in 1995.

Dr. Sandra Elkins, the Knox County Medical Examiner, testified that she had performed the autopsy on the victim. She testified that she had observed "curved lacerations to the left top of the head that had been closed with surgical staples." The victim had a large stapled wound to his chest, where surgery had been performed. Dr. Elkins observed bruises on the victim's right and left arms, a large bruise on his left flank area, and a superficial cut to his right lower arm. She said that the victim had a stab wound to his chest, which had been cut through in the making of the surgical incision. The stab wound had penetrated the right ventricle of the victim's heart, as well as part of his left lung. Before reaching the hospital, the victim had lost so much blood, primarily because of the stab wound to his heart, that his heart had stopped. He was resuscitated, but the massive blood loss had reduced the flow of oxygen to his brain, resulting in irreversible damage. His death was caused by the stab wound to the chest. Dr. Elkins testified that the lacerations to the victim's head had been caused by a blunt object, and the wounds were consistent with his having been struck with the butt of a pistol.

Adam Faw testified that he was 17 years old at the time of the incident and had been dating Christina Martin for about six months. He had known the defendant and Takeita Locke for about

a month and a half or two months. He said that on the evening of October 16, 1998, he and Martin were at his apartment and had been drinking. The defendant and Locke arrived at about 11 or 12 p.m. They all got into Faw's van and rode around for an hour or two, drinking alcohol and smoking marijuana, brought by the defendant, which had been "laced with coke or crack." They went to "the strip," which is on Cumberland Avenue in Knoxville. Faw testified that he "had plans to go rob somebody," and discussed this with his three passengers. He said that he and the defendant argued about the robbery, because the defendant "already had someone else to rob." The defendant directed Faw to drive to a certain apartment in Montgomery Village. After Faw had parked his van, the defendant got out, carrying Faw's pistol. Locke got out with the defendant, and they went into the apartment building.

Seven to ten minutes passed, as Faw and Martin remained in his van, and, then, a woman in front of him began screaming. He saw the defendant and Locke come running out of the building, and they got back into his van. Faw asked the defendant what had happened and how much money he had gotten. The defendant said that he had gotten $50, and Faw asked the defendant to return the pistol. Faw testified that the defendant "had blood all down his arms, and he had a pull-over coat, and it had blood all over that coat, too." Faw said that he had been charged with especially aggravated robbery as the result of the incident, and had pled guilty to the charge in juvenile court.

During cross-examination, Faw admitted that he had told police initially that it was Martin's idea to ride around that night with the defendant and Locke, and that he did not know the defendant. Also, he had initially told police that he did not know why the defendant had his pistol that night, and that he thought the defendant was going to his grandmother's house in Montgomery Village.

Robert Richards testified that he was 34 years old and was dating Karen Verklas. He said that he was at her apartment in Montgomery Village the evening of October 16, 1998, and Chuck Newman had been there for "about 20 minutes or so." Newman returned between 5:30 and 6:00 a.m. the next morning, Verklas opening the door for him. As she started to close the door after admitting Newman, the defendant "just hit the door and knocked it back open. He come right on in." As this was occurring, Richards was lying on the couch in the living room. The defendant "forced [Newman] right on into the kitchen, backed him up into the corner right there at the sink and the stove."

At first, the defendant looked as if he were "just playing" with the victim, but the defendant then began saying, "Look, just give me the money. Just give me the money." The victim was responding, "No, no." Richards then heard a cartridge being chambered into a gun. Richards testified that the two began "wrestling with each other" and came into the living room, where Richards was still on the sofa. The defendant "had [the victim] laying almost flat down on his back on the couch. And he just started wailing [sic] away on him[,]" hitting the victim in the head. He said that the victim was attempting to fight back but "wasn't doing any good." Richards tried to get the defendant off the victim but was unable to do so.

-4-

As Verklas was leaving the apartment, the defendant's girlfriend entered, stood at the end of the couch, and "was trying to pry [the victim's] hands open." The defendant kept saying "[g]ive me the money," and the victim was screaming for help and saying "no." Richards left the apartment and was about to get into his truck, when he saw Verklas come from another apartment, where she had made a telephone call to 9-1-1 for assistance. Richards then returned to the apartment and described the victim as "just a bloody mess. I mean, he had been beaten severely." Takeita Locke returned to the apartment and asked the defendant, "How much money do you think he has got on him?" The defendant replied, "I know at least 150." Locke then said, "Oh, give us the money. Give us the money."

Defense counsel then cross-examined Richards, apparently utilizing a typed statement which he had made several years earlier to a "Detective Brown." In response to the statement that he had not told Brown "anything . . . about a hundred dollars and any conversation between [Takeita Locke] and [the defendant]," Richards replied that he may not have, but "that has been two year [sic] ago." He said that he was a friend of the victim and had traded car parts with him. He assumed that the victim used to "come over in Montgomery Village and buy crack." He agreed it was possible that he may not have heard all of the conversation in the kitchen between the defendant and the victim. He said that he had never seen a gun in the defendant's hand, nor seen him "take anything" from the victim. Richards admitted that he had a conviction for aggravated burglary, for which he was on probation for another two years. After the prosecutor had asked Richards additional questions about the statement he had made two years earlier to Detective Brown, Richards agreed, when asked by defense counsel, that the statement made no mention about "a hundred dollars" in a conversation between the defendant and Takeita Locke.

At the conclusion of Richards's testimony, the State rested its case in chief.

The only witness testifying for the defense was the defendant, himself. He said that, on the night of the incident, he had gone to the Montgomery Village Apartments with Adam Faw and his girlfriend. On prior visits to the complex, the defendant would "hang out . . . and sell drugs." The defendant testified that the victim approached him as they were both in the parking lot, the victim, apparently, having pulled in behind Faw's vehicle. The defendant previously had sold drugs to the victim, who asked if the defendant "had anything." After the defendant responded that he did, the victim asked that they go to the nearby apartment of Verklas and Richards. The defendant said that he had been to the apartment before and had sold drugs to Verklas.

The victim knocked on the door, according to the defendant's testimony, and was admitted by Verklas, followed by the defendant. The victim asked the defendant to follow him into the kitchen, where, responding to the victim's request, the defendant produced some crack, which he allowed the victim to smoke. The victim then "palmed" the rest of the defendant's crack, which was on a kitchen counter; and the defendant asked for payment for the drugs. No payment was forthcoming by the victim, and the two then began a shoving match.

-5-

As the two were "tussling," they ended up in the living room on the couch. Richards was pulling on the back of the defendant's shirt as the victim was pulling on the front. Pulling Faw's pistol from his pocket, the defendant struck the victim with it, trying to free himself. After he had struck the victim twice more with the pistol, the victim grabbed it. He said that the victim then obtained possession of the pistol, and he picked up a knife and stabbed the victim. He intended only to stab the victim in the arm to make him drop the pistol, but, apparently, the victim moved. He denied robbing the victim or that he had told Adam Faw that he had gotten $50 from the victim.

During cross-examination, the defendant agreed that he had struck the victim hard enough with the pistol to cause the "indentation" described by Dr. Elkins.

## ANALYSIS

### I. Absence of Preliminary Hearing Tape

Although a preliminary hearing was conducted in this matter, the tape of the hearing was found to be blank. Consequently, the defendant filed a motion to remand the matter to the Knox County General Sessions Court for another preliminary hearing. The trial court denied the motion, and the defendant has assigned as error that denial.

Tennessee Rule of Criminal Procedure 5.1(a) provides, in pertinent part, as follows:

> The evidence of the witnesses is not required to be reduced to writing by the magistrate, or under the magistrate's direction, and signed by the respective witnesses; but the proceedings shall be preserved by electronic recording or its equivalent and when the defendant is subsequently indicted such recording shall be made available for listening to by the defendant or defendant's counsel to the end that they may be apprised of the evidence introduced upon the preliminary examination.

In reviewing this issue, we must put the matter into procedural context. The defendant was first charged in this incident in October 1998, in a warrant issued by the Knox County General Sessions Court. A scheduled preliminary hearing was reset several times because of the unavailability of one of the State's witnesses. In March 1999, the defendant was first indicted for first degree felony murder and especially aggravated robbery. The trial court then granted a motion filed by his counsel to dismiss the indictment because he had not been afforded a preliminary hearing. Another warrant was filed, and a preliminary hearing, which produced the blank audiotape, was held in the Knox County General Sessions Court. On December 2, 1999, the defendant was indicted a second time for first degree felony murder and especially aggravated robbery. Defense counsel filed a motion on January 27, 2000, to remand for a second preliminary hearing, and the trial court overruled the motion on April 11, 2000. The defendant's trial began on September 18, 2000.

At the hearing on the motion for new trial, the fact of the blank audiotape of the preliminary hearing was argued as a basis for a new trial; and, after extensive arguments on the matter, the trial court denied the motion, explaining its reasons for not granting the motion in view of the absence of an audiotape of the preliminary hearing:

> That they had reset the case a number of times for a preliminary hearing and then taken it to the grand jury just before they had the preliminary hearing. The guise was at the time that this Adam Faw, who was the juvenile, was in custody somewhere, and couldn't be there, and they had to bring him back, and they were going to do that. And then just before they had the hearing or were scheduled to have the hearing, they indicted Mr. Graves.
>
> I found that was bad faith on the part of the District Attorney's Office and remanded the case to Sessions Court for a preliminary hearing in that matter. You had one. You had the opportunity to have the preliminary hearing there.
>
> But I think more important – and, apparently, it was not preserved. I am not questioning that. So I think the question is pretty clear and pretty distinct here for the Court of Criminal Appeals to address – but what you did have in this case that you don't have in many other cases is the opportunity to review the testimony of these witnesses from several hearings. I mean, we had the prior trial in which the co-defendant in this case was tried – both Mr. Richards and Ms. Verklas testified in that case.
>
> Mr. Green reminds me that you had this statement of Mr. Richards that was given to the police that was available to you and for impeachment purposes, the testimony at a previous hearing. So I think, if there was ever a case in which the harmless error analysis should apply, this is that case.
>
> If the Court of Appeals is of the opinion that it is an absolute rule, let [them] say so. I think that you had the opportunity to be presented with all of this information in great detail, and that was available to you, and this truly is a matter of form over substance.
>
> So I am going to overrule it, understanding – you know, if it was presented to me in a different posture – in other words, had the timing of this been different, I might even view it differently. But I think, based on the posture of this case that it is in, I don't find that there is

merit to that argument. So I am going to overrule it. It is clearly an appellate issue.

The trial court noted, in denying the request for a second preliminary hearing, that Richards had testified regarding the incident on several occasions prior to his testimony in the instant trial. The record reflects that Richards testified first at a hearing to determine whether the case of the codefendant, Takeita Locke, should be transferred from juvenile court to the Knox County Criminal Court. At the trial of Locke, which occurred in October 1999, Locke's trial counsel utilized a transcript from the transfer hearing during his cross-examination of Richards. The record on appeal contains a transcript of Locke's juvenile court transfer hearing which recites that it was held on December 9, 1998, less than two months after the incident. At the hearing, Karen Verklas testified she was just leaving the apartment as Takeita Locke entered. Verklas watched as Locke approached the defendant and the victim struggling on the couch, Locke then trying to pry open the victim's hands, saying, "Give me the money. Give me the money." Robert Richards also testified at the transfer hearing, saying it appeared the defendant was trying to get something out of the victim's hands. However, Richards was not asked about any statements by the defendant or the victim, and did not volunteer that he heard either speak.

During the trial of Takeita Locke,[1] Richards testified that, as the defendant came into the apartment just behind the victim and pushed him into the kitchen, the defendant said over and over to the victim, "Just give me the money. Give me the money." He said that the defendant was "trying to get something out of [the victim's hands]." Shortly thereafter, as the defendant was sitting on top of the victim and striking his head, the defendant was asked by Takeita Locke, as she was trying to pry open the victim's hands, "How much has he got on him?"

The defendant's preliminary hearing, following his being charged for a second time with first degree felony murder and especially aggravated robbery, was conducted on October 7, 1999. Richards's testimony at that proceeding occurred slightly less than a week before he testified in the trial of Takeita Locke. Defense counsel filed a motion on January 27, 2000, to dismiss the indictments and remand the matter for a second preliminary hearing upon learning that the audiotape of the October 7 hearing was blank.

The defendant has claimed that there "were inconsistencies, or, at least, embellishments in Richards' testimony at trial that were not included in his sworn account at the preliminary hearing," arguing that counsel's notes from that hearing do not reflect that the defendant demanded money from the victim while both were in the apartment, that the victim refused to give money to the

---

[1]The defendant's girlfriend, Takeita Locke, was also indicted and convicted of felony murder and especially aggravated robbery. See State v. Takeita M. Locke, No. E2000-00923-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 460 (Tenn. Crim. App., Knoxville, June 25, 2001), perm. to appeal granted (Tenn. Dec. 17, 2001). The trial on her indictments occurred before that in this case, and, as the trial court recited, Karen Verklas, Robert Richards, and Adam Faw all testified at Locke's trial.

defendant, or that the defendant told Takeita Locke that the victim had "at least 150" on him. Thus, the defendant claims that Richards's trial testimony was "'new' and more elaborate" than was his testimony at the preliminary hearing. This may well be true, but counsel's description of a less elaborate version of Richards's testimony makes it sound nearly identical to that which he gave at the juvenile transfer hearing for Locke and a transcript of which was available.

Considering the procedural, evidentiary, and practical aspects of this matter, we cannot conclude that the trial court erred in not remanding for a second preliminary hearing. The stated purpose for the requirement that the preliminary hearing be recorded is so that the defendant and counsel "may be apprised of the evidence introduced upon the preliminary examination." Tenn. R. Crim. P. 5.1(a). Counsel was apprised of the evidence because she was present and representing the defendant at the preliminary hearing. Although, practically speaking, statements from a preliminary hearing are often used at trial for cross-examination, Tennessee Rule of Criminal Procedure 5.1(a) does not recognize that practice as a reason for the recording requirement. In reviewing the extent to which defense counsel had fodder for the cross-examination of Robert Richards, we note that, at the time of the defendant's trial, there were available transcripts of Richards's testimony at both Takeita Locke's juvenile transfer hearing and criminal court trial, the former not mentioning any statements by the defendant. Additionally, defense counsel possessed, and utilized, in cross-examination at the defendant's trial, a statement which Richards had made to Detective Brown, the statement not including any mention of a sum of money from the victim or, in fact, any conversation between the defendant and Takeita Locke.

Even if we assume for argument purposes that one of the reasons for taping preliminary hearings is to facilitate more effective cross-examination of witnesses at a subsequent trial, the remand motion would still fail. It was not within the power of the trial court to return to the preliminary hearing which produced the blank audiotape and expect that Robert Richards would testify in the second hearing exactly as he had done in the first. In fact, the temporal relationships of this matter are such that Richards's testimony at a second preliminary hearing, where defense counsel hoped that he would not testify as to money demands by the defendant, would occur after he had testified in Locke's trial as to the specifics of such demands. The possibility that he would again omit such details cannot be the basis for ordering a second preliminary hearing. Further, defense counsel used for cross-examination of Richards his statement to Detective Brown which, like his unrecorded testimony at the preliminary hearing, did not mention a conversation between the defendant and Locke about money. Thus, we conclude that the error in not producing a recording of the preliminary hearing was harmless. See State v. Carter, 970 S.W.2d 509, 512 (Tenn. Crim. App. 1997); State v. Butts, 640 S.W.2d 37, 38 (Tenn. Crim. App. 1982).

## II. Limiting Cross-Examination of Karen Verklas

The defendant has assigned as error the trial court's not allowing the State's witness, Karen Verklas, to be questioned during cross-examination as to a pending criminal charge. At trial, this matter developed in the following fashion.

During cross-examination, after Verklas had been questioned about and admitted her three worthless check convictions, the following then occurred:

Q.  And you are awaiting trial right now for assault?

A.  So?

MR. GREEN:  Your Honor, I object to that.

THE COURT:  Ms. Shipley.

MS. SHIPLEY:  Well, Your Honor, I think it does go to –

THE COURT:  Ms. Shipley –

MS. SHIPLEY:  Yes, Your Honor.

THE COURT:  – I sustain the objection.

Q.  That is correct though.  You are the Karen Verklas that was convicted of worthless checks?

A.  Yes.

MS. SHIPLEY:  That is all I have of this witness, Your Honor.

The jury was then excused for lunch, with the following additional comments being made as to the aborted questioning of Verklas about the pending charge:

THE COURT:  Ms. Shipley, how would you like it if somebody asked about one of your witnesses if they were getting ready to go on trial for something?

MS. SHIPLEY:  Well, Your Honor, I think it is relevant to her bias. I respect the Court's ruling, but I think it is relevant that she is awaiting trial for something.

THE COURT:  You know that is not admissible.  All right.  Be back at 1 o'clock.

On appeal, the defendant argues that the trial court's limitations of the cross-examination of Verklas violated the rights guaranteed by the Sixth and Fourteenth Amendments to the United States

Constitution as well as Article I, Section 9 of the Tennessee Constitution. He claims on appeal that the fact of the pending charge was "relevant to Miss Verklas' motives to please the prosecution where she had a pending charge, and where her 'fiancé' Robert 'Rabbit' Richards was facing revocation of his probation – quite literally the loss of his freedom[.]"

In examining this claim, we note first it is clear that a defendant has the right to cross-examine a witness about bias. In State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001), our supreme court explained:

> A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. See State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); see also State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). An undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. See Smith, 893 S.W.2d at 924; see also State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991).

However, the situation in Sayles was far different from that of the instant case. An incarcerated prosecution witness in Sayles had refused to testify and, then, following a private conversation with a prosecutor, proceeded with his testimony. He testified at the conclusion of his direct examination that no promises had been made regarding his testimony. At the completion of his cross-examination, the prosecutor announced that, because of threats made to the witness, the prosecution recommended that his bail be reduced to $1000. The trial court denied a defense request either to inform the jury of the bond reduction or to make an offer of proof. Our supreme court concluded that the trial court erred in not allowing defense counsel "to probe for the reason that converted [the witness] from a person who was ready to risk perjury in his refusal to testify into a willing and cooperative witness who, without hesitation, solidly incriminated the person against whom he had initially refused to testify." Sayles, 49 S.W.3d at 279-80. Sayles instructs further that, in ascertaining whether the trial court erred in not allowing the desired cross-examination of the witness, the appellate court applies an abuse of discretion standard. Id. at 279.

Similarly, in the earlier case of State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994), our supreme court considered whether a defendant should be permitted to question a prosecution witness who came forward a year after a killing, and claimed that the defendant had confessed to him about "trouble" the witness was in when he contacted law enforcement authorities with the information. The witness testified as to a voluntary manslaughter conviction for which he had served six months, but it was not clear from his testimony whether this was the "trouble" he was facing when he contacted authorities about the slaying. The court concluded that: "In the present case, if the voluntary manslaughter conviction did grow out of the 'trouble' [the witness] was in when he

contacted the authorities, and this is not entirely clear from the record, the trial court should have allowed inquiry into [his] treatment by the State on this conviction." Id.

Thus, the situation presented by Smith also is unlike that of the instant case. We note that the defense counsel in the instant case did not request a jury-out hearing, as permitted by Tennessee Rule of Evidence 104(c). Thus, the aborted questioning occurred in the presence of the jury and was terminated without the record reflecting when the assault charge arose against Karen Verklas or whether it was even pending in Knox County. Accordingly, we are presented with the defendant's claim of reversible error in not being allowed to question a State's witness about an assault charge which was then pending in an unspecified jurisdiction and which had arisen at an unspecified time. Given the factual context of Verklas's testimony and the procedural context in which this arose, several reasons prevent our concluding that the defendant was harmed because his counsel was not permitted to question Verklas about this matter.

First, we note that the trial testimony of Verklas agrees in many material aspects with that of the defendant, himself. She testified that the victim came first into the apartment, soon followed by the defendant, and that they went into the kitchen. She heard the defendant tell the victim, "Give me the money, bitch," and ask several times for "the money." As to this part of the episode, the defendant testified that after he had allowed the victim to smoke some crack, the victim "palmed" the remainder; and the defendant then began demanding payment. Shortly afterwards, Verklas saw the victim on the sofa, with the defendant "on him," and the defendant's girlfriend entered the apartment, and they tried to pry open the victim's hands. Verklas then left the apartment. The defendant testified that he and the victim were "tussling" and ended up on the sofa. He said that his girlfriend, Takeita Locke, came only to the entrance of the apartment. Thus, Verklas's testimony, mostly paralleling that of the defendant, was not inculpatory to the extent of that of the counterpart witnesses in Sayles, who heard the defendant yell, "Payback, mother f-----," and then saw him repeatedly shoot the victim, or as the witness in Smith, to whom the defendant confessed that he cut the victim's throat and put her body in a bathtub. Although the record on appeal does not reflect when Verklas's assault charge arose in relation to the trial of Takeita Locke or of the defendant, we note that Verklas's testimony was consistent in the two proceedings. Further, her testimony at the juvenile court transfer hearing for Locke, two years earlier, was consistent with that at the trials of Locke and the defendant.

In Sayles, the witness whose cross-examination was truncated was "the State's key witness . . . the only witness who testified that he had seen [the defendant] shoot [the victim]." 49 S.W.3d at 280. Thus, the court, not being confident that the violation of the defendant's right to cross-examination was harmless beyond a reasonable doubt, reversed the conviction. However, in Smith, the court determined that any error restricting cross-examination was harmless beyond a reasonable doubt:

> [The witness's] testimony made it clear that it was only after he was "in trouble" that he came forward to tell authorities about Defendant's remarks. Although he denied any deal, and there is no proof there was a deal, he said that he had hoped there might have been one. The

jury also heard he had served only six months on a guilty plea to voluntary manslaughter. The Defendant's confession to his niece and the presence of his fingerprints in the bedroom corroborated [the witness's] testimony. We find no reversible error.

893 S.W.2d at 924.

In contrast to the "key witness" status of the witness in <u>Sayles</u>, Verklas testified that she had left the apartment before the blows which resulted in the victim's death were inflicted. Thus, she did not contradict the most critical portion of the defendant's testimony. Further, she was impeached with prior worthless check convictions, and the jury was not instructed to disregard her response of "So?" when asked if she was "awaiting trial right now for assault." Given these evidentiary and procedural distinctions between the instant case, and the analyses set out in <u>Sayles</u> and <u>Smith</u>, we are confident, beyond a reasonable doubt, that if the trial court erred in not allowing Verklas to be questioned further about the pending assault charge, the error was harmless.

### III. Limiting Cross-Examination of Robert Richards

The defendant argues that his trial counsel should have been allowed to cross-examine the State's witness, Robert Richards, as to his pending probation violation warrant. This dispute began, out of the presence of the jury, as the witness was brought into the courtroom:

> THE COURT: We will let you get dressed here in a minute, Mr. Richards. The reason I wanted you here, Mr. Green – Ms. Shipley raised the issue of this warrant that has been taken out. Obviously, the fact that Mr. Richards has been convicted of aggravated burglary and theft is going to be a matter that she can go into, in terms of impeaching his credibility. The question is she also wants to go into the fact that there has been a violation of probation warrant taken out on Mr. Richards, which I took him in for last Friday, set for the day after tomorrow for hearing. And I wanted you to have an opportunity to know that was about to happen and voice any objection. I initially said to Ms. Shipley I thought that was something she could address. After I got to thinking about it, I am wondering if this isn't akin to a charge, as opposed to an adjudication of guilt.

> MS. SHIPLEY: Your Honor, again, I don't know the nature of what his VOP is about.

> THE COURT: The allegations are that he failed to report to his probation officer; that he used illegal drugs; that he failed to pay his required fees; that he failed to pay court costs and hadn't done his community service.

-13-

MS. SHIPLEY: Well, that was part of his agreement with the plea deal that he do all of that.

THE COURT: My point is that no adjudication has been made at this stage whether or not he is guilty of this. These are allegations.

MR. GREEN: But assume that just for the sake of assuming he is guilty of every bit of that, how does that have anything to do with – she is going to get to impeach him with the fact that he is convicted of aggravated burglary. What does this have to do with that?

THE COURT: Well, that's – I guess I am going to hear from Mr. Green.

MS. SHIPLEY: Again, Your Honor, it is part of his agreement to do probation.

MR. GREEN: How?

MS. SHIPLEY: He made certain promises to the Court that he is going to comply with probation.

MR. RUSSELL GREEN: Well, Your Honor, I agree with the Court in that we still have a whole hearing to go on that; and, once we present our case on that, the Court may have a different view of that violation at that time. That is always a possibility; and, until we have that, I don't think it is relevant.

THE COURT: I would also note that Andy Delgado is the probation officer. Are you going to tell him to invoke his –

MR. GREEN: That is exactly why she wants to ask these questions, so he will invoke his Fifth Amendment privilege.

THE COURT: Well, I am asking you.

MR. GREEN: Just cut right through it.

THE COURT: He has the right to do that if he is instructed to do it. Are you going to tell him to do that?

MR. RUSSELL GREEN:  Well, Your Honor, I am not going to try this violation right here in this courtroom until I have a chance Wednesday.

MS. SHIPLEY:  Again, Your Honor, I think it is relevant.

THE COURT:  Anybody want to say anything else?

MR. GREEN:  Well, I need to go across the hallway; but, obviously, I am getting boxed in the corner.  If she is allowed to go into this, I am put in a position where I either have to have my witness invoke the Fifth Amendment or I have to grant him immunity, and it is not relevant, Judge.  It is not relevant to what we are doing here today.

MS. SHIPLEY:  It is relevant, Your Honor.

MR. GREEN:  It is a red herring, and she knows it.

MS. SHIPLEY:  It is not a red herring.  When you give a defendant probation, it is not a guarantee.  He makes certain promises to you that he is going to comply with the terms of his probation.  When he doesn't do so, that goes toward his honesty and truthfulness.

MR. GREEN:  So I take it then, by that line of logic, were Mr. Graves to take the stand, if he has threatened a guard downstairs, that becomes a relevant matter for impeachment, because he is obviously under the rules when he is downstairs.  He is supposed to follow those.

THE COURT:  This is what I am going to do, Ms. Shipley.  I think obviously you can impeach him with the fact that he has been convicted of aggravated burglary and theft in Case 68116.  I don't know.  He may have other convictions also that you can impeach him with.  I believe that at this stage of the proceedings is an allegation against Mr. Richards and which there has been no adjudication, and indeed this Court is going to be called upon to make that adjudication here in the future.  For that reason, I think it is akin to an arrest, which is not a proper basis to impeach a witness with, and I am going to rule that you can't go into the violations.  You can, obviously, impeach him for the convictions.

Before the trial court, the defendant argued that Richards could be questioned about the pending probation violation because his breaching of the probationary promises "goes toward his

honesty and truthfulness." On appeal, however, the defendant's theory is that his Sixth Amendment rights were violated by his counsel's not being allowed to cross-examine Richards about the pending probation violation warrant, whereby counsel could have established "that the witness had a compelling reason to slant his testimony in favor of the prosecution." Thus, the trial court declined to allow cross-examination as to Richards's pending violation of probation warrant, the defendant's argument being that the commission of these acts go to his "honesty and truthfulness." However, the argument in this court is that the cross-examination was proper because it would demonstrate Richards's motive to please the prosecution. As stated in State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993), "[a]n appellant cannot change theories from the trial court to the appellate court." Accordingly, we conclude that this issue is not properly before this court.

However, even if we proceed as if the trial court had been presented with and rejected the argument that questions about Richards's violation of probation warrant were admissible to demonstrate his bias in favor of the prosecution, we would conclude that the defendant is not entitled to a new trial. Our analysis of the issue as to Richards would be very similar to that of the defendant's claim that his counsel should have been permitted to question Karen Verklas about her pending assault charge. The record reflects that Richards had testified both at the juvenile court transfer hearing for Locke as well as at Locke's trial, which had occurred prior to that of the defendant. The probation revocation warrant had been served just prior to Richards's appearance at the defendant's trial, but well after his testimony at Locke's trial. We have compared Richards's testimony at both of these trials, and they differ only in minor ways. No facts were shown at the trial, as had been the case in Sayles, which would provide any basis for believing that Richards was shading his testimony in hopes of, or because of, favorable treatment by the State for his pending probation violation. In fact, the comparison of his testimony at the two trials belies such a claim. We note further that, had the defendant been permitted to cross-examine Richards and Verklas about the pending matters, the door might have been opened for the prosecution to present proof of prior statements which were consistent with their testimony at the instant trial and predated the alleged incentive of each to testify falsely. See generally, Neil P. Cohen et al., Tennessee Law of Evidence § 8.05[5] (4th ed. 2000).

Accordingly, we conclude that this issue is without merit.

### IV. Autopsy Photograph

As Dr. Elkins, the Knox County Medical Examiner, was testifying on direct examination and had said that, during the autopsy, the victim's scalp was peeled back so that his brain could be removed, the State asked that a photograph showing this be made an exhibit. The issue arose when the State asked Dr. Elkins about photographs which she had brought to court:

> Q.  I note that you have some photographs, Dr. Elkins. Are these photographs of Mr. Newman?
>
> A.  Yes.

Q. And are there any of – I see there are some that were – the photograph that I am showing you, does that actually depict some of the trauma to the skull that you were just talking about?

A. Yes.

Q. Okay. Explain what I am seeing and what you are seeing as you are looking at that photograph.

A. That basically – at autopsy, in order to examine the skull and remove the brain, the first thing we have to do is totally peel the scalp off of the outer part of the skull. This picture is after the scalp has been peeled back, and the picture is showing the outer part of the left side of the skull with the fracture in the outer table of the skull.

MR. GREEN: May this be marked and filed as No. 10?

THE COURT: Any objection?

MS. SHIPLEY: Yes, Your Honor, may we approach?

THE COURT: Yes, I need to look at that.

    (Whereupon, a bench conference was held on the record in the presence of the jury, but out of the hearing of the jury, and the following proceedings were had:)

MS. SHIPLEY: Your Honor, I don't object to the photograph of the scalp before autopsy; but, after the skull has been peeled back, I think it is prejudicial. I don't think that would pass the test in Banks, and you know, we are not in dispute that an argument happened.

MR. GREEN: Well, they are trying to couch this in terms of self-defense struggle where.

THE COURT: I wish you had brought this up before.

MS. SHIPLEY: I haven't seen that photograph either. I met with Dr. Elkins and didn't see that photograph.

THE COURT: I am going to reserve judgment on this until – on whether or not it is introduced – until after I have had an opportunity to talk to you about it outside the presence of the jury.

-17-

Subsequently, out of the presence of the jury, the admissibility of the photograph was again discussed:

THE COURT: With regard to this picture, you know, Mr. Green, very candidly, I don't know what it adds to her testimony. I mean, I don't see – I mean, it is not like you can see – I have let a skull in where there is an indentation from a hammer that you can see the indentation from a hammer, because it makes sense that is what caused it, but this is just a – it appears to me to be nothing more than a big bloody wound. I mean, I can't –

MR. GREEN: But look at the picture, Judge.

THE COURT: I am.

MR. GREEN: Dr. Elkins just testified to that is looking at the subdural region of his head. That is after the skin has been pulled back.

MS. SHIPLEY: Your Honor, that is why it is prejudicial. It is an autopsy picture.

MR. GREEN: Well, that shows some pretty significant injury, if you are looking at an indentation after the skin has been pulled back. That is what Dr. Elkins testified to.

MS. SHIPLEY: Well, it is not in dispute that he suffered head injuries.

MR. GREEN: Well, it is in dispute, though, as to how all of that happened.

THE COURT: First of all, let me say that it doesn't shock my conscience. My question is – and therefore it sort of passes that test. I don't think it is inflammatory or prejudicial. My question is its relevance or its value as evidence rather than whether or not it is prejudicial. I don't think it is prejudicial. I mean, it is blood, and it has been described as the inside of a wound. I guess what your point is, Mr. Green, is that this shows the severity of the blow because of the fact that there is an obvious tearing of the skin, even below the surface of it. I am going to let it in, Ms. Shipley.

The standard of review and applicable law regarding the admissibility of photographs was set out in State v. Carruthers, 35 S.W.3d 516, 576-77 (Tenn. 2000) (Appendix), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001):

> The admissibility of relevant photographs and videotapes of the crime scene and victims is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). See also, State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). Moreover, the modern trend is to vest more discretion in the trial judge's rulings on admissibility. See Banks, 564 S.W.2d at 949; State v. Bailey, 01C01-9403-CC-00105, 1995 WL 424996 (Tenn. Crim. App., Nashville, July 20, 1995); perm. to app. denied, (Tenn. Jan. 8, 1996).

After viewing the photograph, the trial court concluded that it showed the "severity of the blow" and allowed it to be shown to the jury. In view of the contending theories, that the wound to the victim's head occurred either as the defendant was beating him into submission, or, as the defendant was trying to free himself, we cannot conclude that the trial court abused its discretion in admitting the photograph into evidence.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE