IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 22, 2005

## STATE OF TENNESSEE v. ALFRED WILLIAM SMITH

**Appeal from the Criminal Court for McMinn County**
**No. 03-073     R. Steven Bebb, Judge**

_____

### No. E2004-01058-CCA-R3-CD - August 2, 2005

_____

The defendant, Alfred William Smith, appeals from his 2004 McMinn County jury conviction of first degree premeditated murder, for which the trial court imposed a life sentence. On appeal, the defendant challenges the sufficiency of the convicting evidence and the admission of state-sponsored testimony. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

R. Joshua McKee, Athens, Tennessee, for the Appellant, Alfred William Smith.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General, *Pro Tem*; and Phil Morton, Assistant District Attorney General, *Pro Tem*, for the Appellee, State of Tennessee.

### OPINION

To facilitate our review of the sufficiency of the evidence in this opinion, we will summarize the evidence in the light most favorable to the state. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

On Sunday morning January 12, 2003, the body of the victim, Betty White, was discovered near the edge of a field along McMinn County Road 448. The victim had suffered multiple trauma to her head and body, and her body had been run over by a vehicle.

Shanda Bivens, a friend of the victim, testified that she visited the victim on January 11. In the midafternoon, a green car went by the victim's residence, and the victim said, "There goes Al." Later, the victim spoke on the telephone with someone she addressed as "Al," and Ms. Bivens overheard the victim tell the person, "It's over." The victim was upset and crying. Ten or fifteen

minutes later, the defendant, who had been the victim's boyfriend, stopped his vehicle on the road in front of the victim's residence, and the victim walked to the road to talk to the defendant. The vehicle was a green Mercury that the defendant and the victim owned jointly. The victim later talked on the phone again and told the person on the line, "It's over."

The victim's 18-year-old son, Dustin Rymer, testified that the defendant and the victim had maintained a relationship for five or six years before the victim's death. He testified that, on one occasion, he came to their residence and found the defendant holding a knife to the victim's throat, and a few days later he found the defendant with his fist drawn back to hit the victim in the face. On both occasions, Mr. Rymer chased the defendant away from the reisidence with a baseball bat. Mr. Rymer testified that these episodes precipitated an estrangement of the couple.

On the evening of January 11, 2003, Mr. Rymer came home about 8:30 and ate dinner. He then left to go to his girlfriend's house. The victim called Mr. Rymer about midmight and told him she would be ready to go to church the next morning. Apparently, Mr. Rymer came home and went to bed, but when he awoke Sunday morning, the victim was not in the residence. He learned of her demise about 11:00 a.m.

Bernice Cansler testified that in the late night of January 11 and early morning of January 12, 2003, she was standing on the premises of McMinn Villa hoping to obtain cocaine. She saw the victim, whom she knew, drive up in a green car, and the defendant, whom she also knew, was riding in the passenger seat. The defendant got out of the car and engaged in a conversation or transaction with another individual, got back in the green car, and left. The green car returned again between 3:00 and 4:00 a.m., and the same scenario was repeated.

Sherby Collom, the defendant's son-in-law, testified that the defendant occupied a room in the house where Mr. Collom and his family resided. When Mr. Collom came home from work about 11:00 p.m. on January 11, 2003, the green Mercury was parked in its usual place, and based upon the voices that Mr. Collom heard and recognized, the defendant and the victim were in the defendant's room. Mr. Collom noticed that the defendant and the victim were still in the defendant's room about 1:30 a.m., and when he awoke at 7:30 the next morning, the defendant was in his room asleep. Later that day, the police came to the house, and Mr. Collom gave them permission to search the house. A few days later, the family's puppies pulled out a pair of the defendant's tennis shoes from under a rug in the laundry room, and Mr. Collom gave the shoes to the police. Also, one of the puppies pulled one of the Mercury's floor mats from behind an abandoned refrigerator behind the house. The mat was stained, and Mr. Collom gave it to the police.

Other testimony revealed that, on January 12, 2003, a bent, blood-stained machete with broken handles was discovered alongside the road in the general vicinity of the victim's body. A sheath that would have accommodated the machete was found in the grass near the victim's body.

Upon gathering information about the victim and her associates, the investigating officers went to the Collom residence in search of the defendant. The green Mercury parked in the

Collom's yard had a clump of grass protruding from the driver's door. At the officers' request, the defendant unlocked the car and allowed them to inspect it. They found a large pool of blood in the front floor of the passenger's side. The floor mats were missing. What appeared to be blood on the passenger door had been wiped. Underneath the car, the officers saw what appeared to be blood and also black hair wrapped around a bolt on the undercarriage. The swatch of hair had caught an earring that matched an earring found in the center of the victim's neck at the crime scene.

A Tennessee Bureau of Investigation (TBI) agent who interviewed the defendant testified that the defendant showed no emotion when told that the victim had been killed. In the interview, the defendant admitted that he had been with the victim until midnight but that she had taken the Mercury home afterward. He claimed to have no knowledge how the car was returned to the Collom residence by Sunday morning.

Serological tests revealed that the machete, the interior and the undercarriage of the Mercury, and the floor mat retrieved from behind the discarded refrigerator all bore the victim's blood. A pair of the defendant's tennis shoes also bore some of the victim's blood. An analysis of a laboratory slide containing material taken from the victim's vagina revealed the presence of the defendant's DNA. No fingerprints, however, were found on the machete, and the jeans worn by the defendant on the night of January 11-12 bore none of the victim's blood.

The McMinn County medical examiner testified that the victim suffered three different types of injuries. First, she sustained parallel slash injuries to the back of her right forearm. The injuries were caused by an object that was not sharp-edged but one that was applied with enough force to break the arm. Second, the victim had been stabbed by a single-edge knife – there were "many, many" stab and slash wounds to the face, upper neck, and left side of the trunk. The victim's throat had been slit several times. Third, the victim sustained blunt force trauma from being dragged under the vehicle. This trauma resulted in broken ribs and a fractured right hip.

Testifying for the defendant, his daughter, Katrina Collom, opined that she would have heard the defendant using the washing machine or shower on the night of January 11-12, but she heard him do neither. Furthermore, he did not announce a departure from the house on Saturday night as he normally would do, were he leaving.

Mary Smith, the defendant's former wife, testified that she had engaged in altercations with the victim because of the victim's relationship with the defendant. She testified that, on one occasion, Dustin Rymer came to the Smith residence looking for the defendant. She testified that Mr. Rymer demanded to see the defendant and beat on the door with a "jungle knife."

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of

guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 8 (Tenn. 2000).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *State v. Jones*, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); *State v. Lequire*, 634 S.W.2d 608 (Tenn. Crim. App. 1982). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant. *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971); *Jones*, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Crawford*, 225 Tenn at 484, 470 S.W.2d at 613; *State v. McAfee*, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Cabbage*, 571 S.W.2d at 835. Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

The crime of which the defendant stands convicted is the "premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2003). Once the evidence establishes that a homicide has occurred, it is presumed to be second degree murder. *State v. Gentry*, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993). To elevate the crime to the greater offense of premeditated first degree murder, the state must prove premeditation.

The defendant claims that the circumstantial evidence in the present case fails to establish beyond a reasonable doubt either that he killed the victim or that, if he did so, that he acted with premeditation. We disagree.

In the light most favorable to the state, the evidence not only supports the conviction beyond a reasonable doubt but also excludes every other reasonable hypothesis but that the defendant killed the victim. A rational trier of fact could have inferred that, on Saturday, January 11, 2003, the victim was trying to terminate her relationship with the defendant and that he was calling and coming to her residence in response to her declaration, "It's over." Later that evening, the victim and the

defendant were together in the defendant's room at the Collom residence, and on two occasions thereafter, they frequented a drug trafficking location where the defendant apparently bought drugs.

Inferentially, the couple were last seen together between 3:00 and 4:00 a.m. The victim's hacked and mangled body was found only a few hours later. The car owned and used by the couple was found at the defendant's residence. It contained large amounts of the victim's blood, and the undercarriage of the car bore the victim's blood and her hair – unquestionably evidence of the vehicle's use to run over the victim. A floor mat containing the victim's blood had been removed from the car and placed behind an abandoned refrigerator. Although the machete that bore the victim's blood did not bear the defendant's fingerprints and although the clothes worn by the defendant on the night of January 11-12 did not bear the victim's blood, her blood was found on a pair of the defendant's shoes. The defendant engaged in sexual intercourse with the victim within a period of time short enough to enable the toxicologist to detect the presence of his DNA on her vaginal slide. We hold that this evidence unerringly points the finger of blame at the defendant and supports the jury's conclusion that he murdered the victim.

The evidence also established beyond a reasonable doubt the element of premeditation.

A premeditated act is "one done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (2003). "'Premeditation involves a previously formed design, or actual intention to kill.'" *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992) (quoting *Lewis v. State*, 40 Tenn. 127, 147-48 (1859)). It is the process "of thinking about a proposed killing before engaging in the homicidal conduct." *Id.* at 541. "[N]o specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan . . . ." *Id.* at 543. Premeditation "may be shown by circumstantial evidence." *Id.* at 541; *see State v. Carter*, 970 S.W.2d 509, 516 (Tenn. Crim. App. 1997). Thus, premeditation may be inferred from the circumstances surrounding the killing. *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). For instance, facts which might allow a jury to infer premeditation include:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is planning activity;
>
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
>
> (3) facts about the nature of the killing from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). In particular, Tennessee courts have identified some relevant circumstances: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the state the opportunity to establish intent. *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). The courts theorize that such evidence is probative of the defendant's *mens rea* at the time of the homicide because it reveals a "settled purpose" to harm the victim. *Smith*, 868 S.W.2d at 574.

The evidence in the present case showed that the defendant had previously evinced a purpose to harm the victim. Motive is suggested by evidence that, on the eve of her murder, the victim was trying to extricate herself from her relationship with the defendant and that he was not going away quietly. The victim and the defendant came together on Saturday night and spent several hours together. Based upon the events at McMinn Villa, drugs may have been involved in the couple's experience that night. Two different deadly weapons were used against the unarmed victim, and she was savagely stabbed and slashed many times. Apparently after she was stabbed and slashed in this manner, she was ejected from the car, and the driver ran over her and dragged her some distance underneath, tearing out hair, breaking ribs, and breaking a hip. Thus, the killing was particularly cruel. *See State v. Davidson*, 121 S.W.3d 600, 616 (Tenn. 2003) ("The jury could also have inferred premeditation from Davidson's treatment of Jackson's body in this case. The mutilation of the body, particularly the slicing of Jackson's torso from the neck to the abdomen, indicates that the killing was motivated by a desire for some sort of gratification and was not a rash or impulsive killing."). Also, it may reasonably be inferred that, subsequent to the homicide, the defendant returned to his residence, attempted to wipe the car door, removed and hid the blood-soaked floor mat, and went to sleep. When questioned later on Sunday, he evinced a calm demeanor and expressed no emotion when informed that the victim had been killed.

On balance, we hold that these facts support the jury's finding of premeditation. *See Davidson*, 121 S.W.3d at 615 ("Several facts support a finding of premeditation when viewed cumulatively in the light most favorable to the State.").

In the defendant's second and final issue, he argues that the trial court erred in permitting Bernice Cansler to testify that, when the green car returned to McMinn Villa between 3:00 and 4:00 a.m. on Sunday, January 12, she assumed the victim was driving as she had been when the same car in which the defendant was riding came to McMinn Villa earlier in the night. Ms. Cansler testified, "I don't know who was driving but I assumed it was [the victim], but I don't know who it was."

We hold that the defendant has waived appellate review of this issue. No contemporaneous objection was made when the testimony was given. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record . . . ."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Furthermore, the issue was not raised in the defendant's motion for new trial. *See* Tenn. R. App. P. 3(e) (in jury cases, no error may be predicated upon the admission of evidence unless the claim "was specifically stated in a motion for new trial; otherwise such issue[] will be treated as waived").

Moreover, we see no basis for treating the claimed error as plain error. *See* Tenn. R. Crim. P. 52(b) (allowing for plain error review of issues that affect the "substantial rights" of an accused). In the present case, Ms. Cansler acknowledged in her testimony that she did not see the driver of the green car during its last visit to McMinn Villa and that she did not *know* who drove the car on that occasion. Obviously, she "assumed" the victim drove the car because she had seen the victim driving the car during an earlier visit. We conclude that the tenor and parameters of Ms. Cansler's assumption were revealed to the jurors, who thus had an opportunity to draw their own inferences from the evidence about who drove the car the second time. In short, we see no substantial right of the defendant implicated by Ms. Cansler's testimony.

In conclusion, we affirm the conviction.

_____
JAMES CURWOOD WITT, JR., JUDGE