IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2019

## WILLIAM FLOYD CARTWRIGHT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Putnam County**
**No. 04-0694A      John D. Wootten, Jr., Judge**

_____

### No. M2018-01544-CCA-R3-PC

_____

The Petitioner, William Floyd Cartwright, challenges the denial of his petition for post-conviction relief attacking his jury conviction for first degree premeditated murder.  On appeal, the Petitioner first raises a free-standing claim that the jury instruction requiring the jury to "accept the law as given by the [trial] court" was violative of the Tennessee Constitution and warrants post-conviction relief.  The Petitioner then alleges that he received ineffective assistance at trial due to trial counsel's (1) failure to move for a new preliminary hearing due to an incomplete recording of the first; (2) failure to fulfill a promise made during opening statement that the victim was on house arrest with supporting proof at trial; (3) failure to adequately cross-examine the medical examiner about the victim's cause of death; (4) failure to seek to have the proof re-opened in order to call the co-defendant to the stand after the co-defendant had accepted a plea; and (5) failure to object to the aforementioned jury instruction.  He also submits that the cumulative effect of trial counsel's errors deprived him of a fair trial.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Douglas A. Trant and Julia Anna Trant, Knoxville, Tennessee, for the appellant, William Floyd Cartwright.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Beth E. Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

The Petitioner was tried for the first degree premeditated murder of Marvin Martin, Jr. ("the victim"). See Tenn. Code Ann. § 39-13-202. On September 16, 2005, a Putnam County jury convicted the Petitioner as charged, and he was subsequently sentenced to life imprisonment with the possibility of parole. The Petitioner was tried along with a co-defendant, Christopher Servo, who was charged with facilitation of first degree murder for his involvement in the victim's murder. The co-defendant entered a plea to aggravated assault after the proof had closed and just prior to closing statements. The co-defendant received an agreed-upon six-year sentence, and the State "agreed to a cap of one-year split confinement."

The State presented the following evidence at the Petitioner's trial. See generally State v. William Floyd Cartwright, No. M2007-00500-CCA-R3-CD, 2008 WL 902093, (Tenn. Crim. App. Apr. 3, 2008), perm. app. denied (Tenn. Sept. 29, 2008). On the evening of August 27, 2004, the victim was at the Cookeville home of Lakeisha Darty. Id. at *1. He was there drinking, along with Ms. Darty and her two roommates, Sherry Rooks and Tiffiney Reagan. Id. Ms. Reagan and the Petitioner were involved in an affair at the time. Id. At some point in the evening, Ms. Darty left the residence and went to a local bar where she encountered the Petitioner, Ms. Darty's cousin by marriage. Id. The victim stayed at the house that evening, as did Ms. Rooks and Ms. Reagan. Id.

When the bar closed in the early morning hours of August 28, 2004, Ms. Darty drove home, and she was accompanied by her friend Jennifer Vinson, the Petitioner, and Josh Cartwright ("Mr. Cartwright"), "another of their cousins." Cartwright, 2008 WL 902093, at *1. According to Ms. Darty, when they left the bar, the Petitioner did not appear intoxicated, but he "was upset with [Mr.] Cartwright for 'disrespecting' their grandmother." Id. At one point, the Petitioner hit Mr. Cartwright, leaving blood in Ms. Darty's car. Id. The Petitioner "said, in reference to disrespect of his grandmother, he never wanted to see 'that' again." Id. The group arrived at Ms. Darty's house "where [the Petitioner] continued to push [Mr.] Cartwright around in the yard." Id.

Ms. Darty went to wake up Ms. Reagan. Cartwright, 2008 WL 902093, at *1. When Ms. Reagan awoke, she saw the Petitioner, "whom she described as 'very drunk,' arguing with [Mr.] Cartwright, who had blood on his face." Id. The victim intervened and told the Petitioner to leave Mr. Cartwright alone. Id. The Petitioner responded by hitting the victim in the face, "knocking the victim's glasses from his face[,] and telling him that this was none of his business but was family business." Id. Ms. Darty helped the victim find his glasses, and then she left to drive Ms. Vinson home. Id.

Thereafter, the Petitioner received a phone call, and Ms. Reagan heard him say, "I'm at Tiffiney's, you need to get over here right now." Cartwright, 2008 WL 902093, at *2. Ms. Reagan saw the following events transpire next:

- 2 -

Ms. Reagan . . . saw [the Petitioner] "just turn around and hit" the victim, who had not touched [the Petitioner] to this point. [Ms.] Reagan saw the two move to the side of the house, and she saw [the Petitioner] pull the victim's shirt off. She heard the victim say, "Tug,[1] that's enough, please stop, I didn't do anything." [Ms.] Reagan said, thereafter, she saw mostly shadows and silhouettes, and she heard someone hit the car. She next saw [the Petitioner] kicking and "stomping" on the victim in the front yard. [Ms.] Reagan said that, approximately three times, she yelled "Tug, that's enough, stop," prompting [the Petitioner] to walk away briefly but return to beating the victim. [Ms.] Reagan never saw the victim attempt to defend himself.

At that point, [Ms.] Reagan went and awakened [Ms.] Rooks, telling her that [the Petitioner] was "beating up" the victim. When [Ms.] Reagan came back to the doorway of the front porch, she saw [the co-defendant] standing on the porch. [The Petitioner] was still stomping on the victim's head, and the victim had his stomach down on the ground.

Id. (altered footnote in original).

According to Ms. Rooks, she was going to call 9-1-1, but both the co-defendant and Ms. Reagan told her that "it wasn't that bad, that everything was okay." Cartwright, 2008 WL 902093, at *2. Nonetheless, Ms. Rooks went inside the house and called Ms. Darty, telling her to get there quickly. Id.

Ms. Reagan observed the Petitioner tell the co-defendant to come and help him, and they tried to carry the victim out of the yard. Cartwright, 2008 WL 902093, at *2. Ms. Reagan continued,

They could not and ended up dragging him by his feet, face down, toward the porch. When they placed the victim on the porch, [the Petitioner] appeared to be grabbing at the victim's clothes, perhaps in an attempt to take his shorts off. Ms. Reagan noticed that [the Petitioner's] silver Reeboks were covered in blood. [The Petitioner] then grabbed the victim's hands and dragged him into the shed. The victim was, at first, sitting in the shed, and [the Petitioner] pushed him onto his side.

Id.

---

[1] The Petitioner's nickname was "Tug."

- 3 -

Thereafter, Ms. Darty arrived and attempted to approach the Petitioner, but Ms. Reagan told her to wait because they did not know what the Petitioner would do. Cartwright, 2008 WL 902093, at *2. When the Petitioner left the shed and walked away, Ms. Darty ran to the shed and pulled the victim out from inside. Id. Ms. Darty yelled to Ms. Rooks for help because she could not find the victim's pulse. Id. The two women began performing CPR, and after doing so, Ms. Rooks felt a faint pulse. Id. Although Ms. Darty called 9-1-1, they decided to drive the victim to the hospital, so she hung up. Id. As the women were attempting to load the victim into Ms. Reagan's SUV, the Petitioner, who appeared uninjured, returned and assisted them. Id. The Petitioner "told the girls to say that they found the victim in their yard in his present condition" and instructed them that they "better not say what happened." Id. The Petitioner "also told [Ms.] Reagan not to take the victim to the hospital if he did not have a pulse. They were all scared of what [the Petitioner] might do if they told the truth." Id.

Richard G. Clark, a staff physician in the emergency room at Cookeville Regional Medical Center, testified that he retrieved the victim from Ms. Reagan's vehicle but could not find a pulse. Cartwright, 2008 WL 902093, at *4. After unsuccessfully performing "advanced life support measures[,]" the doctor pronounced the victim dead at 4:07 a.m. Id. Dr. Clark said that he "could tell from the injuries that the victim had suffered some blunt trauma to the face and body, along with skin abrasions consistent with being dragged across concrete." Id.

When Ms. Reagan was informed of the severity of the Petitioner's injuries, she called the Petitioner. Cartwright, 2008 WL 902093, at *2. However, the co-defendant answered and said that the Petitioner was sleeping. Id. Ms. Reagan informed the co-defendant that the victim was dead. Id. The Petitioner and the co-defendant then fled to Lebanon, Tennessee to stay with a friend, Frederick Lashane Garrett. Cartwright, 2008 WL 902093, at *3. They arrived at Mr. Garrett's home later in the day on August 28, 2004. Id. According to Mr. Garrett, while there, the Petitioner told him "that he had gotten into a fight where he punched, kicked, and slammed a guy around and said he was laughing while beating the man." Id. The Petitioner and the co-defendant were later apprehended in Nashville on August 31, 2004, while they were en route to the Clarksville bus station "to catch a bus." Id.

Detective Carl Sells, with the Cookeville Police Department, "interviewed the women." Cartwright, 2008 WL 902093, at *3. He stated that the women "were not initially truthful with him about what had happened, telling him they found the victim lying in their front yard and someone must have left him there." Id. However, he opined that later, they all gave "full statements consistent with their trial testimony." Id.

Upon processing the crime scene, "the victim's blood was found on a welcome mat on the porch, in the grass in the front yard, and in two places in the shed."

- 4 -

Cartwright, 2008 WL 902093, at *3. Also, "[t]he victim's glasses, and a lens separated from those glasses, and the victim's shirt were found near the house." Id. Additionally, "[t]he morning after the beating, [Ms.] Rooks had noticed a new dent in the driver's side right fender of her car, which had been parked near where the beating occurred. . . . [A] sample was taken of what appeared to be dried bodily fluid on the fender, but the test results returned inconclusive." Id.

Dr. Feng Li, the medical examiner, testified to the following regarding the victim's injuries and cause of death:

> [A]n external examination of the victim's body revealed he suffered injuries 'all over the body.' The victim had areas of abrasions, contusions, and lacerations to multiple areas of his body. The victim's skull bone was fractured, and he had orbital bruises. The victim's injuries were the result of blunt force, and a combination of these injuries resulted in his death. The doctor opined that the most severe injuries were the skull f[r]actures and hemorrhages. The victim's injuries were consistent with his head being stomped upon while he lay on the ground. The doctor said that the victim suffered 'brush burns,' which were consistent with the victim being dragged across concrete.

Cartwright, 2008 WL 902093, at *4. Dr. Li stated that he measured the victim and that the victim was five-feet, four-inches tall. In addition, the victim's blood alcohol level was determined to be between .15 and .19; no drugs were detected in his system. Id. Dr. Li admitted "that the victim's blood alcohol level was over twice the legal driving limit in Tennessee." Id.

Following his conviction, the Petitioner filed a direct appeal to this court, raising a single issue—"that the evidence [was] insufficient to sustain his conviction because the State did not prove that he acted with premeditation." Cartwright, 2008 WL 902093, at *1. The Petitioner contended that, at most, he should have been convicted of voluntary manslaughter. Id. at *4. This court affirmed the judgment, and the Tennessee Supreme Court denied the Petitioner's permission to appeal on September 29, 2008.

The Petitioner, with the assistance of counsel, filed a timely petition for post-conviction relief on April 2, 2009. The next document in the record is an order of continuance filed on October 7, 2016, which is accompanied by an "Order for a Psychological and DNA Evaluation" filed the same day. An amended petition was filed on August 3, 2017, by present post-conviction counsel. In the amended petition, the Petitioner alleged that "[i]t was error for the court to charge the jury that it could not disregard the law that is given by the court"; no separate allegation of ineffective assistance was raised with regard to trial counsel's failure to challenge this jury

- 5 -

instruction. As for the Petitioner's specific ineffective assistance allegations, he cited the following instances[2]: (1) trial counsel failed to seek a new preliminary hearing once trial counsel became aware that the prior hearing was not recorded in total; (2) trial counsel failed to fulfill his promise to the jury made during opening statement that the victim was on house arrest at the time he was murdered with supporting proof at trial; (3) trial counsel failed to sufficiently develop the victim's cause of death and "evidence that the fatal blow was not indicative of an intent to kill"; and (4) trial counsel failed to call the co-defendant to the stand whose testimony "would have mitigated the charge of murder in the first degree."[3] An evidentiary hearing was held on July 12, 2018.

We briefly digress to note that Tennessee Code Annotated section 40-30-109 provides for a prompt evidentiary hearing. Section 40-30-109(a) states that if the petition for post-conviction relief is not dismissed, the post-conviction court "shall enter an order setting an evidentiary hearing . . . no later than thirty (30) days after the filing of the [S]tate's response[,]" and "the evidentiary hearing shall be within four (4) calendar months of the entry of the court's order[.]" Any "extension shall not exceed sixty (60) days." There is no order entered pursuant to Code section 40-30-109(a) included in the technical record. Two different trial judges recused themselves before the present trial judge was appointed, but that did not occur until August 2017. Also, sometime between April 2, 2009, and October 7, 2016, original post-conviction counsel was allowed to withdraw and present post-conviction counsel was appointed, although there is no order in the record to this effect. It is unclear why over nine years elapsed between the Petitioner's filing of his original petition for post-conviction relief and the evidentiary hearing occurring. Such a lengthy delay is inexcusable. We note that trial judges have an obligation to manage their dockets in a timely manner, see Tennessee Supreme Court Rule 10, Rule of Judicial Conduct 2.5, and defense lawyers and prosecutors have an ethical obligation to make reasonable efforts to expedite litigation, see Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.2.

Returning to our summation of the proof presented at the evidentiary hearing, the Petitioner called his co-defendant Christopher Servo to testify. With regard to the events surrounding the victim's death, the co-defendant testified that he did not arrive at the house until 3:30 a.m. and that the victim was already injured and lying in the front yard upon his arrival. The co-defendant indicated that he did not witness the Petitioner beat the victim or the argument between the Petitioner and the victim that led to the beating.

---

[2] Although the Petitioner raised other grounds for relief in his petition, we will focus only on those issues that are the subject of this appeal.

[3] For continuity, we have rearranged the order of the issues as presented in the petition so that they remain consistent on appeal.

When the co-defendant arrived, the Petitioner asked him to help carry the victim onto the porch, so they could "check him out" and "make sure he was okay." The co-defendant believed that the victim was alive at that time.

According to the co-defendant, he and the Petitioner carried the victim "face up" by his arms and legs. The co-defendant indicated that he was approximately five-feet, ten-inches tall and described the victim as "slender" and "taller" than him. The co-defendant testified that he and the Petitioner unintentionally dropped the victim as they were trying to carry him onto the porch. He could not recall whether the victim's back or head hit the ground first when he was dropped. The co-defendant denied that he told the women not to dial 9-1-1. He likewise claimed that he did not help the Petitioner carry the victim's body to the shed next to the house, only to the front porch. In addition, the co-defendant affirmed that he did not witness the victim's being put in Ms. Reagan's car. The co-defendant said that he left the scene by himself. When the co-defendant later received the phone call from Ms. Reagan informing him that the victim had died, he conveyed the information to the Petitioner, who he was with at that time. According to the co-defendant, the Petitioner appeared "[s]hock[ed]" by the news.

The co-defendant confirmed that he was tried along with the Petitioner, that he chose not testify at trial after being advised by counsel, and that he ultimately pled guilty to the lesser-included offense of aggravated assault following the conclusion of proof. When asked to explain his plea, the co-defendant said that he was guilty of aggravated assault by a "technicality": "[S]ince I wasn't a properly trained EMT, and [the Petitioner] and I helped move [the victim] to the porch from the yard, that [the victim] may have sustained some . . . injury, and that's how they got me." The post-conviction court then referenced the following excerpt from the trial transcript depicting the circumstances surrounding the co-defendant's plea:

> [TRIAL COURT]: . . . [A]re you guilty of this offense?
> [THE CO-DEFENDANT]: In a manner of speaking, I suppose I am. But I do want to specify that I never hit, kicked, stomped or anything that has been brought out. I want to make sure that is perfectly clear to everybody in the courtroom, the family and everybody.
> [CO-DEFENDANT'S COUNSEL]: Thank you. [Co-defendant], the testimony was that witnesses saw you pick up [the victim], along with the [Petitioner]. There has been evidence entered that he was carried, that he was dragged, that he was dropped.
> Do you understand that if he was dragged and received injuries that could be considered aggravated assault?
> [THE CO-DEFENDANT]: I understand that. That's—

[CO-DEFENDANT'S COUNSEL]: Do you also understand that if he were dropped that that could be considered aggravated assault?

[THE CO-DEFENDANT]: Yes.

[CO-DEFENDANT'S COUNSEL]: Okay. Do you understand that that's the basis for these charges, not that you, there's been no testimony you struck him personally, but that's the basis for the aggravated assault? Do you understand that?

[THE CO-DEFENDANT]: I understand that.

The co-defendant affirmed that he was ultimately sentenced to a year in jail and six months on probation for his guilty plea conviction.

The Petitioner was next to testify. He confirmed that both he and members of his family were familiar with trial counsel prior to trial and that trial counsel had represented him in a prior matter. The Petitioner estimated that trial counsel met with him three or four times to prepare for trial and the preliminary hearing, although the Petitioner could not recall the exact number. Trial counsel visited the Petitioner in jail and mailed him packages of documents related to his case, including the autopsy report, the witness statements, and motions that trial counsel had filed. The Petitioner acknowledged that he had prior experience with the criminal justice system because he had a criminal record. The record of the Petitioner's trial was exhibited to the post-conviction hearing.

The Petitioner maintained that he and trial counsel never discussed the possibility of the co-defendant's testifying after the co-defendant pled guilty to aggravated assault. The Petitioner acknowledged that he did not ask trial counsel to put on any witnesses and that he chose not to testify at trial.

The Petitioner asserted that he had since read the preliminary hearing transcript and confirmed that it "cut[] off at some point." A copy of the incomplete transcript was entered as an exhibit to the post-conviction hearing. According to the Petitioner, there was varying testimony by two of the witnesses from the preliminary hearing to trial. The Petitioner maintained that at the preliminary hearing, these two witnesses testified consistently with their police statements about how the Petitioner kicked the victim a few times, but by the time of trial, their description of the beating "intensified" and made the crime far worse than "it actually seemed." For instance, the witnesses testified at the preliminary hearing that the Petitioner "kicked [the victim] three times," but at trial, they said that he "kicked [the victim], took off walking, came back, kicked him again, took off walking when someone called, and came back and kicked him again, and that never happened." Moreover, while the Petitioner admitted that he punched the victim in the chest, he denied that he hit the victim with any kind of object.

The Petitioner indicated that he "had a brief discussion" with trial counsel about trying to impeach these witnesses with their preliminary hearing testimony but that he was told they could not "do that." Moreover, he claimed that trial counsel never informed him that the recording of the preliminary hearing was incomplete.

The Petitioner recalled trial counsel's telling the jury during opening statement that the proof would show that the victim was under house arrest. However, trial counsel never discussed this with the Petitioner, and the Petitioner did not recall any testimony or proof at trial about the victim's being on house arrest.

The Petitioner asserted that trial counsel did not discuss with him whether to object to the erroneous jury instruction telling "the jury that . . . they were to follow the laws" as instructed by the court. The Petitioner indicated that the jury should have been instructed "that they were the judges of the law." In addition, the Petitioner maintained that he did not discuss the victim's cause of death with trial counsel, although he had reviewed the autopsy report prior to trial. The Petitioner stated that he learned during his psychological evaluation that the victim died from a "busted" blood vessel in his head and not from a fractured skull caused by force. Moreover, the Petitioner noted that the victim was taller than him, the victim's standing about six-feet, four-inches tall in the Petitioner's estimation. The Petitioner claimed that the autopsy report, which was entered into evidence at the hearing, incorrectly notated the victim's height as much shorter than he actually was.

The State called trial counsel to testify. Trial counsel testified that he had been licensed to practice law since 1980, and he had represented clients in homicide trials when he represented the Petitioner. Trial counsel indicated that he had known the Petitioner since the Petitioner was a kid. In addition, trial counsel had previously represented the Petitioner and the Petitioner's family members in other matters. According to trial counsel, it was possible that "a lot of boys" were probably "scared of [the Petitioner] because he was just so big and strong." However, trial counsel indicated that in the years he had known the Petitioner, he had never witnessed the Petitioner's being violent.

Trial counsel affirmed that he remembered the witnesses testifying at the Petitioner's preliminary hearing and cross-examining those witnesses. Trial counsel maintained that he did not "know that the recorder at the preliminary hearing malfunctioned," but he claimed that he "knew exactly what was said at the preliminary hearing." When asked if he sought a recording of the preliminary hearing, trial counsel said, "I don't know that I did, because I have a relatively good memory." Trial counsel said that he probably would not have sought a new preliminary hearing even if he had known that the recording was incomplete, reasoning, "It would have been the same testimony, I would expect." According to trial counsel, "[b]y the time the jury trial rolled

- 9 -

around, [he was] familiar with those witnesses and . . . able to cross-examine all the witnesses that testified for the State during the jury trial[.]"

Because fifteen years had elapsed since trial, trial counsel could not recall the exact number of times he met with the Petitioner to prepare for trial. Although the Petitioner was unable to make bond and was incarcerated, trial counsel was certain that he met with the Petitioner given the serious nature of the charge. Trial counsel added that there was not a lot a client in custody could do to assist in the defense because jails calls and meetings were recorded. Trial counsel had asked for permission not to have his communications recorded for other clients, but they were recorded anyway and introduced at trial. He acknowledged that he does not visit a client in jail regularly unless he has to tell the client something or ask the client something.

Trial counsel indicated that he had asked for and obtained the services of an investigator, Ron Lax, who interviewed many of the potential witnesses. Trial counsel testified that while Mr. Lax was in the process of speaking with the witnesses, Mr. Lax was admonished by the trial judge for "harassing the witnesses." Trial counsel explained that he began talking to witnesses after Mr. Lax quit. The Petitioner requested that trial counsel speak with his girlfriend, which trial counsel did, but she did not provide any useful information. Later, trial counsel received the same admonishment from the trial judge for simply seeking to interview potential witnesses. According to trial counsel, the witnesses were reluctant to talk to him because they were "scared to death" of being charged as accessories to the victim's murder or for other reasons. He confirmed that he was aware of the State's potential witnesses and reviewed their statements with the Petitioner. Trial counsel was likewise certain that he and the Petitioner discussed the defense theory prior to trial.

Trial counsel did not recall commenting during opening statement that the proof would show that the victim was under house arrest. Although he could not recall the victim being under house arrest, trial counsel explained that he would not have said so during opening statement unless it were true.

Trial counsel was unable to talk to the co-defendant prior to trial because the co-defendant was represented by counsel throughout the entire trial process, and trial counsel was unable to call the co-defendant as a witness during the proof because he was tried jointly with the Petitioner. Trial counsel recalled that just prior to closing arguments, the State offered the co-defendant a deal, which he accepted. Trial counsel explained how the co-defendant's involvement impacted the Petitioner's case:

> I don't think [the co-defendant] had done anything. [The co-defendant] was on the scene. I think he helped move the victim to the back yard. I think he was holding his head, and [the Petitioner] was holding his

feet, and [the co-defendant], I think, admitted that he dropped the boy, and hit his head on the concrete. That . . . he did that. But obviously, it was not within a criminal intent, and that was part of my defense. I was going to be able to show to the jury that they were overcharging [the co-defendant] to the point that it wasn't even funny. And I was hoping then that we could pull [the Petitioner] along on that, with the premeditation part.

When trial counsel was asked if he pursued as a possible cause of the victim's death their dropping the victim on his head on the concrete, trial counsel answered affirmatively. Trial counsel explained, "I'm pretty certain that I asked the doctor is it more likely that blunt force trauma to the head was caused by being dropped on concrete as opposed to being kicked by a pair of tennis shoes. And my recollection is he said, yes, that it was."

Trial counsel was asked if he "could have talked" to the co-defendant after he pled guilty, and trial counsel said that he did in fact do so. According to trial counsel, he spoke with the co-defendant "out in the hall," and the co-defendant was "so apologetic" about accepting the State's offer. However, trial counsel conveyed to the co-defendant that he understood the co-defendant's desire to accept the deal given the lengthy sentence the co-defendant faced if he was found guilty. Trial counsel confirmed that he "did not try to call" the co-defendant to testify as a defense witness for the Petitioner because, prior to that time, he had not been able to "talk[] to him enough" and was unsure of what the co-defendant's testimony would have been, although trial counsel did not believe the co-defendant would have harmed the Petitioner's case had he testified.

When asked whether he recalled the trial judge's instructing "the jury that it could not disregard the law that is given it by the [c]ourt and that the jury are the judges of the fact, but it's the [c]ourt that's the judge of the law[,]" trial counsel responded by stating that the trial judge generally gives that particular instruction. However, in the Petitioner's case, trial counsel did not remember whether the trial judge told "the jury that it must base its decision only on the evidence in the case and the instructions the [c]ourt gives it about the law" and that "it must apply the law that the [c]ourt gives you in the instructions to the facts of the case." Trial counsel was asked if that instruction was an incorrect statement of the law, and he said, "The jurors are the interpreters of the facts, and the [c]ourt is the interpreter of the law." Trial counsel later clarified that the jurors "are the judges of the law" to the extent "the [c]ourt's to instruct the jury [they] are the judge of the facts and law under the direction of the [c]ourt[.]"

The post-conviction court thereafter denied the Petitioner relief by written order filed on August 8, 2018, concluding therein that the Petitioner had failed to establish his entitlement to post-conviction relief. This timely appeal followed.

- 11 -

ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn.

- 12 -

1999)).  "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland."  Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94.  On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings.  Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001).  Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court.  Id.  Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness.  Id. at 457.

## I. Jury Instruction Issue

On appeal, the Petitioner first raises a free-standing claim that the instruction to the jury requiring it to "accept the law as given by the [trial] court" was violative of article 1, section 19 of the Tennessee Constitution and warrants post-conviction relief. The Petitioner also argues that trial counsel was ineffective for failing to object to the jury instruction.

The State responds that the Petitioner's free-standing issue regarding the jury instruction is waived for failing to raise the issue on direct appeal.  As for the Petitioner's ineffective claim, the State contends that trial counsel's decision not to object was reasonable because the trial court gave a correct instruction of the law.  Furthermore, the State maintains that the Petitioner has not shown trial counsel's failure to object was prejudicial.[4]

Initially, we agree with the State that the Petitioner is precluded from raising any free-standing claim challenge to the jury instructions.  "It is well established that a party may not raise an issue in a post-conviction petition that could have been raised on direct appeal."  Floyd W. Smith v. State, No. M2002-01933-CCA-R3-PC, 2003 WL 21486981, at *3 (Tenn. Crim. App. June 27, 2003) (citing State v. Townes, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000), overruled on other grounds by State v. Terry, 118 S.W.3d 355 (Tenn. 2003)).  In addition, "[a] ground for relief is waived if the petitioner personally or

---

[4] As noted above, the Petitioner did not include in his post-conviction petition a separate allegation of ineffective assistance regarding trial counsel's failure to challenge the instruction.  The post-conviction court addressed the issue based upon the testimony presented, and the State does argue for waiver on appeal.  Accordingly, we will review the ineffective claim on the merits.

through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106 (g); see also Townes, 56 S.W.3d at 35. Upon our review of the record, it is clear the Petitioner failed to raise his present claim at any of the appropriate times, including at trial, in his motion for new trial, or on direct appeal. As such, the Petitioner's free-standing issue is waived. See Kedrick Carwell v. State, No. W2017-01899-CCA-R3-PC, 2018 WL 1989621, at *4 (citing Smith, No. M2002-01933-CCA-R3-PC, 2003 WL 21486981, at *3) (waiving any free-standing instruction issue in the post-conviction context because the petitioner failed to raise one at trial, in his motion for new trial, or on direct appeal).

However, because the claim of ineffective assistance of counsel is interwoven with the merits of the underlying issue, it must be addressed. The post-conviction court found with regard to this issue that "[t]he trial judge properly charged the jury with the correct instruction. [Trial counsel's] performance was not deficient[,] and even if it was deficient, the [Petitioner] was not prejudiced[.]" We agree.

Here, the challenged instruction was given by the trial court during preliminary instructions at the outset of trial, said instruction being as follows: "It is your job to determine what the facts of this case are. You must then apply the law that I give you in the instructions to the facts in this case and from that application you will arrive at your verdict." Tennessee Rule of Criminal Procedure 30(d)(1) states that "[i]mmediately after the jury is sworn, the court shall instruct the jury concerning its duties, its conduct, the order of proceedings, the general nature of the case, and the elementary legal principles that will govern the proceeding." The trial court provided complete preliminary instructions, including the challenged portion, in accordance with the Tennessee Pattern Jury Instruction—Criminal 1.00.

The Petitioner complains that the challenged portion of the preliminary instruction violated his rights under article I, section 19 of the Tennessee Constitution.[5] Said provision, in effect, makes the jury the judges of the facts and of the law as it applies to the facts. Scott v. State, 338 S.W.2d 581, 584 (Tenn. 1960). Nothing in the challenged preliminary instruction misstates this principle. Trial counsel should not be faulted for failing to make a meritless objection.

Furthermore, in the formal jury charge following the conclusion of proof, the jury was instructed pursuant to Tennessee Pattern Jury Instruction—Criminal 1.08 about its duty:

> You are the exclusive judges of the facts in this case. Also, you are the exclusive judges of the law under the direction of the court. You should apply the law to the facts in deciding this case. You should consider all of the evidence in light of your own observations and experience in life.

The Petitioner cannot show prejudice.

## II. Preliminary Hearing

The Petitioner argues that trial counsel was ineffective for failing to move for a new preliminary hearing due to an incomplete recording of the first because, being incomplete, it violated the State's duty pursuant to Tennessee Rule of Criminal Procedure 5.1(a) to preserve the proceeding by an electronic recording or its equivalent. The Petitioner, citing State v. Graves, 126 S.W.3d 873, 877-78 (Tenn. 2003), continues that the State's failure to preserve an electronic recording or its equivalent of a preliminary hearing under Rule 5.1(a) requires a dismissal of the indictment and a remand for a new preliminary hearing. The Petitioner surmises that trial counsel's "failure to move to dismiss the indictment and to request a new preliminary hearing was particularly

---

[5] Article 1, section 19 of the Tennessee Constitution pertains to the freedom of speech of the printing presses:

> That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of officers, or men in public capacity, the truth thereof may be given in evidence; and in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases.

(Emphasis added).

prejudicial to [his] rights to a fair trial and effective assistance of counsel because the testimony of the State's witnesses given at the preliminary hearing significantly varied from their trial testimony."

The State responds that trial counsel provided neither deficient performance nor prejudice because trial counsel represented the Petitioner at the preliminary hearing "where he observed the State's proof and had an opportunity to cross-examine the witnesses." The State continues that because trial counsel "'knew exactly what was said at the preliminary hearing,' he was not hampered by the lack of a complete recording." We agree.

The post-conviction court determined that "[t]he preliminary hearing not being fully recorded [was] not an issue" given that trial counsel "cross-examined the witnesses thoroughly during the preliminary hearing and remembered their testimony." The post-conviction court ruled that trial counsel's performance in this regard "was not deficient[,] and even if it was deficient, the [Petitioner] was not prejudiced[.]"

First, we observe that Graves does not stand for the proposition the Petitioner asserts. Graves did not require automatic dismissal of the indictment in cases where the recording requirements of then-Rule 5.1(a) were unobserved. Rather, the "critical issue [was] whether the defense ha[d] been apprised of the evidence introduced at the preliminary hearing by receiving the same information as an 'electronic recording or its equivalent.'" Graves, 126 S.W.3d at 877 (quoting Tenn. R. Crim. P. 5.1(a) (2005)). Accordingly, our supreme court determined that the failure to comply with the dictates of then-Rule 5.1 "require[d] the dismissal of the indictment and a remand for a new preliminary hearing, unless" the prosecution could show that "all material and substantial evidence that was introduced at the preliminary hearing was made available to the defendant" and that "the testimony made available to the defendant was subject to cross-examination." Id. at 877-78 (Tenn. 2003); see State v. Carter, 970 S.W.2d 509, 512 (Tenn. Crim. App. 1997) (determining that "[t]he proper remedy when an electronic recording of a preliminary hearing is lost or unavailable would be to request the trial court to dismiss the indictment and remand to the [g]eneral [s]essions [c]ourt for a second preliminary hearing").

Rule 5.1(a) in effect at time of the Graves decision did not provide a sanction or remedy for failure to prepare, preserve, or make available such a recording. Graves, 126 at 877. However, the rule was amended in 2008 "to provide remedies when the recording of a preliminary hearing is lost or damaged." See Tenn. R. Crim. P. 5.1, Advisory Comm'n Cmt. The Rule now provides, "Where the recording is no longer available or is substantially inaudible, the trial court shall order a new preliminary hearing upon motion of the defendant filed not more than 60 days following arraignment. The indictment shall not be dismissed while the new preliminary hearing is pending."

- 16 -

Tenn. R. Crim. P. 5.1(a) (2016) (emphasis added). It is clear from the amendment that "a defendant's remedy for a lost or damaged recording is merely another preliminary hearing and not . . . dismissal of [the] indictment." See State v. Angela K. Pendergrass, No. E2013-01409-CCA-R3-CD, 2014 WL 1232204, at *5 (Tenn. Crim. App. Mar. 25, 2014). Accordingly, the substance of the Petitioner's argument in this post-conviction case does not hold merit.

In addition, while there is no dispute that the recording equipment malfunctioned during the preliminary hearing, it does not appear that the hearing was substantially inaudible. The incomplete transcript is a part of the record. Ms. Reagan testified first and was followed by Ms. Rooks. The transcript stops during Ms. Rooks's cross-examination and picks up during closing arguments; this is the only notation of the recording equipment's malfunctioning. It is arguably inferable from counsels' summations that these were the only two witnesses presented. The closing argument of trial counsel indicates that only "two stories" were presented by the State during the hearing, and trial counsel points out ways in which these two stories were "internally and externally inconsistent with each other." The prosecutor then attempts to rehabilitate these two witnesses: "There's no proof whatsoever that the two [S]tate's witnesses are not credible. There's no proof that these two ladies were trashed." The hearing concludes with the trial judge's ruling binding the case over to the grand jury. From this transcript, we glean that it was unlikely that dismissal of the indictment would have been warranted and a new preliminary hearing ordered even if trial counsel had filed such a motion.

Importantly, trial counsel represented the Petitioner at the preliminary hearing where he observed the State's proof and had an opportunity to examine the State's proof and cross-examine the witnesses. At the post-conviction hearing, trial counsel was unsure if he ever requested a copy of the preliminary hearing recording because he "knew exactly what was said at the preliminary hearing" and had "a relatively good memory." Trial counsel indicated that he probably would not have sought a new preliminary hearing even if he had known that the recording was incomplete, reasoning, "It would have been the same testimony, I would expect." Trial counsel affirmed that he was familiar with the State's witnesses and prepared to cross-examine them at trial, an affirmation supported by the record. In fact, both Ms. Reagan and Ms. Rooks were cross-examined at trial about statements they made at the preliminary hearing. The Petitioner had all available information from the preliminary hearing, and those witnesses were subject to cross-examination. We agree with the post-conviction court that the Petitioner has established neither deficient performance nor prejudice in this regard.

### III. Failure to Fulfill Opening Statement Promise

The Petitioner submits that trial counsel failed to fulfill a promise made during opening statement that the victim was on house arrest with supporting proof at trial. According to the Petitioner, by failing to substantiate the opening statement with corresponding proof, trial counsel "undermined the credibility of [the Petitioner's] defense theory." The State responds that trial counsel's performance in this regard was not deficient, citing the post-conviction court's finding that this was an "isolated comment" during opening statement, and maintaining that "the record shows that counsel's decision not to introduce proof of the victim's house arrest was reasonable given the trial court's ruling during the defense['s] opening statement." The State further contends that the Petitioner has failed to establish prejudice because he "has not shown how proof of the victim's house arrest would have undermined the outcome of the trial."

During opening statement, trial counsel made the following comments:

Now . . . this was relatively late at night when all this started and there's a reason for that, ladies and gentlemen. We feel like the proof will show that [the victim] was supposed to be on house arrest. He was not supposed to be out at night, was supposed to be home. He had already committed an offense and [as] opposed to being in jail he was supposed to be at home and monitored.

The State lodged an objection: "We're going to object to that proof at this time, Your Honor. There's no foundation that's laid and it is disparaging to the victim." The resulting colloquy ensued:

THE COURT: [Trial counsel], let's---
[TRIAL COUNSEL]: Your Honor, I think that's proper.
THE COURT: Well, I'm ruling that you move on. Let's not tarry on that issue.
[TRIAL COUNSEL]: Okay.
THE COURT: Move on.

No further reference was made about the victim's being on house arrest, and no evidence of such was put forth by the defense at trial.

The post-conviction court found that trial counsel was not deficient in this regard, nor had the Petitioner established prejudice. The post-conviction court referred to it as an "isolated comment" made by trial counsel in a case about "two drunks in a fight." In certain circumstances, the failure to present evidence promised during the opening statement constitutes ineffective assistance of counsel. State v. Zimmerman, 823 S.W.2d 220, 225-26 (Tenn. Crim. App. 1991). "The trial attorney should only inform the jury of the evidence that he is sure he can prove. . . . His failure to keep [a] promise [to the jury] impairs his personal credibility." Id. at 225 (quotation omitted). Our supreme court

- 18 -

noted that in <u>Zimmerman</u>, it was counsel's sudden, unwarranted change in trial strategy that resulted in the deficient performance. <u>King v. State</u>, 989 S.W.2d 319, 332 (Tenn. 1999) (citing <u>Zimmerman</u>, 823 S.W.2d at 224, 226). However, the supreme court held that a change in defense strategy did not rise to the level of the ineffective assistance of counsel when it occurred in response to surprise testimony or other change in the proceedings. <u>See</u> <u>id.</u>

We have reviewed trial counsel's opening statement in this case. Trial counsel set out the defense theory and made assertions regarding the evidence, including that the victim was intoxicated on the evening in question, that "it was two drunks fighting," and that the Petitioner lacked premeditation. The trial court's admonishment to trial counsel not to "tarry on" the issue of the victim's house arrest was made in front of the jury after an objection by the State. Under these circumstances, trial counsel's failure to produce evidence of the victim's being on house arrest after promising it in his opening statement would not have significantly impaired his credibility. We do not believe that trial counsel's failure rose to the level of ineffective assistance of counsel. <u>See</u> <u>Charles Ritter v. State</u>, No. E2008-01278-CCA-R3-PC, 2009 WL 3711991, at *9 (Tenn. Crim. App. Nov. 6, 2009) (finding that counsel's failure to provide evidence of the victim's alternate source of sexual knowledge did not rise to the level of ineffective assistance of counsel because the defense strategy was not abandoned arbitrarily but in response to rulings from the trial court).

## IV. <u>Victim's Cause of Death</u>

The Petitioner notes that the medical examiner was only able to opine that the victim's cause of death was multiple blunt force trauma but was unable to specify which injury caused the victim's death. The Petitioner then indicates that the "testimony of the witnesses and Dr. [Li] revealed the possibility that [the victim's] death resulted from an injury to his head received when he was accidentally dropped on the concrete." However, trial counsel, according to the Petitioner, was ineffective by failing "to elaborate on that possibility through thorough cross-examination of Dr. [Li]." The State responds that the Petitioner failed to show that trial counsel's cross-examination of the medical examiner amounted to ineffective assistance.

The post-conviction court cited the medical examiner's testimony that the victim received "multiple blows," "multiple injuries," and "multiple causes of death." Nonetheless, the post-conviction observed that the State was not required "to prove which blow did it." The post-conviction court surmised that trial counsel's performance "regarding the cause of death" was neither deficient nor prejudicial.

As noted above, Dr. Li testified that the victim suffered multiple injuries all over his body, that the victim's injuries were the result of blunt force, and that a combination of these injuries resulted in his death. Cartwright, 2008 WL 902093, at *4. The medical examiner "opined that the most severe injuries were the skull factures and hemorrhages" and that "[t]he victim's injuries were consistent with his head being stomped upon while he lay on the ground." Id. Furthermore, the medical examiner also classified the skull fractures and hemorrhages as "the most fatal in this case," and he surmised that the manner of death was "assault[] by others."

On cross-examination by trial counsel, Dr. Li indicated that if he had "to pick one injury" leading to the victim's death, he would "say the bleeding inside the brain would" have been "the most serious." Dr. Li agreed that in the autopsy report, he "didn't specifically indicate which blow or which injury caused the death[.]" Dr. Li also agreed that his conclusions were "based upon all the circumstances that had been furnished" to him. Trial counsel also focused his cross-examination on the discrepancy in the victim's height, the victim's level of intoxication, and the victim's possible respiratory issues. Co-defendant's counsel next examined Dr. Li, and Dr. Li agreed that the victim's injuries were likewise consistent with being hit by a car.

The jury also submitted questions for the medical examiner. Dr. Li was asked about possible injuries to the victim after death, possible causes of the congestion seen in the victim's lungs, if previous calculations of the victim's height and weight were available, whether the victim exhibited any signs of a panic attack, whether untrained individuals moving the victim or delay in his treatment precipitated the victim's death.

When asked about a specific scenario, the medical examiner agreed that if a car fender were made of a "hard enough" material, the victim's head injuries were "consistent with blunt force trauma of his head being slammed into a car fender during a fight[.]" Dr. Li was shown a photograph of Ms. Rooks's fender, and he opined that it was "probably not" capable of producing the victim's skull fractures. It was also noted that Ms. Rooks's fender did not appear to exhibit much damage.

Dr. Li was presented with another scenario, the jury's asking whether stomping the victim's head against the ground could have caused the victim's skull fractures, to which he replied it was "very hard to [have] cause[d] the skull fractures by the stomp alone." But, Dr. Li clarified that it was possible if done with sufficient force or repetition. Dr. Li also stated that the type of shoes worn would impact his decision and that the victim's injuries were "not likely" caused by someone wearing tennis shoes. He was unable to say with any certainty whether the victim was "directly facing down" when he was injured. Nonetheless, Dr. Li affirmed his opinion that the manner of death was the victim's suffering multiple impacts while being assaulted by another individual or individuals, although he could not say for certain.

- 20 -

Most importantly, Dr. Li was presented with the following scenario: "If a body is carried face down and dropped on the concrete, could this cause a skull fracture?" Dr. Li replied, "Again, it varies from the height. I mean obviously if it's a very low height, it might not. If there's a, you know, high area and dropped to the ground, yeah, it could." Trial counsel then inquired, "And that would be more apt to cause a skull fracture than kicking or stomping with tennis shoes, would it not?" Dr. Li responded, "It could in theory. But again, based on the height." Upon further questioning by trial counsel, Dr. Li agreed that a person could "already be unconscious" before getting "their skull fractured from other separate incidences[.]"

Here, the medical examiner testified at length. Trial counsel asked the medical examiner if his conclusions were "based upon all the circumstances that had been furnished" to him, and the medical examiner answered affirmatively. Moreover, the jury's questions indicated that they had been supplied with evidence of several other possible causes for the victim's skull fractures and hemorrhaging in addition to the State's theory. Their questions were suggestive of conscious reflection. Although trial counsel did not ask the medical examiner about the victim's being dropped on the concrete during his initial cross-examination, the medical examiner did discuss the issue based upon the questions submitted by the jury. The jury had clearly been provided with evidence to support said theory prior to the medical examiner's testimony. Trial counsel, after the question, got Dr. Li to concede that such a scenario "could in theory" be "more apt to cause a skull fracture than kicking or stomping with tennis shoes" and that the injuries could have been received after the victim was already unconscious. Accordingly, we agree with the post-conviction court because we cannot say that the record supports either deficient performance or prejudice with regard to trial counsel's questioning of the medical examiner. See, e.g., Lonnie Lee Owens v. State, No. M2011-02188-CCA-R3-PC, 2013 WL 1384936, at *17 (Tenn. Crim. App. Apr. 4, 2013) (finding no deficiency when the medical examiner was cross-examined about an alternative cause of death).

## V. Co-Defendant Servo

In a similar vein, the Petitioner alleges that trial counsel was ineffective for failing to move to re-open the proof in order to call the co-defendant to the stand after the co-defendant had accepted a plea. According to the Petitioner, after the co-defendant pled guilty, the co-defendant "was no longer a defendant and could have been subpoenaed" to testify. The Petitioner asserts that the co-defendant's testimony would have mitigated the charges of first degree murder. The State replies that the Petitioner has failed to prove that trial counsel's failure in this regard was ineffective because trial counsel's decision was reasonable under the circumstances and that the co-defendant's testimony was not sufficient to support any alternative cause of death.

- 21 -

The post-conviction court determined that the Petitioner did not establish either prong of ineffective assistance of counsel due to trial counsel's failure to call the co-defendant at such a late juncture in the trial. We agree. Before trial, trial counsel was unable to talk with the co-defendant because the co-defendant was tried jointly with the Petitioner and represented by counsel. The co-defendant did not plead guilty until the proof had been closed and the jury was awaiting the trial court's formal instructions. Trial counsel, as he averred at the post-conviction hearing, would have been unaware of the exact details of the co-defendant's testimony at that stage of trial. His decision not to call the co-defendant was certainly reasonable.

Additionally, the defense had already been presented to the jury that the victim's injuries may have resulted from his being dropped or hitting his head on the concrete, that the co-defendant was involved, and that any such actions were accidental. Ms. Reagan testified at trial that she observed the Petitioner and the co-defendant carrying the victim from the yard onto the porch, and later testimony established that the porch was concrete. According to Ms. Reagan, the Petitioner was carrying the victim by his "head and shoulders," and the co-defendant had the victim by the legs before they dropped him, although Ms. Reagan believed any drop was "accidental." Ms. Reagan then observed the co-defendant dragging the victim face down by his feet onto the porch. Both doctors testified that the victim had injuries consistent with being dragged across the concrete. As noted above, the medical examiner was asked if the victim's injuries could have been caused during such a scenario, and he agreed that they in fact could. During closing argument, trial counsel argued that it was the co-defendant who dropped the victim and also that any drop was unintentional. Moreover, the co-defendant's testimony served little to bolster the theory that the victim was dropped on the concrete hard enough to cause his injuries. The co-defendant also testified inconsistently with other witnesses, which would have impacted his credibility. Accordingly, the Petitioner has shown neither deficient performance nor prejudice based upon trial counsel's failure to call the co-defendant to testify.

## VI. Cumulative Error

The Petitioner also submits that the cumulative effect of trial counsel's errors deprived him of a fair trial. The cumulative error doctrine recognizes that in some cases there may be multiple errors committed during the trial proceedings, which, standing alone, constitute harmless error; however, considered in the aggregate, these errors undermined the fairness of the trial and require a reversal. State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). This court has also considered this doctrine in the context of ineffective assistance of counsel. See Gary Hawkins v. State, No. W2016-00723-CCA-R3-PC, 2017 WL 2829755, at *8 (Tenn. Crim. App. June 30, 2017). In this case, we have concluded

that counsel was not deficient in any respect.  Therefore, cumulative error doctrine does not apply.

_____
D. KELLY THOMAS, JR., JUDGE